[No. A057581. First Dist., Div. Three. Mar. 30, 1994.]

EVEA MERLE WILLIAMSON, as Special Administrator, etc., et al., Plaintiffs and Respondents, v.
PLANT INSULATION COMPANY, Defendant and Appellant.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮

COUNSEL

Charles Bond, Siegfried Hesse, Heather A. McKee, Stefanie Y. Gandolfi, Jackson & Wallace and John R. Wallace for Defendant and Appellant.

Debevoise & Plimpton, Roger E. Podesta, Jonathan E. Richman, William S. Adams, Wright, Robinson, McCammon, Osthimer & Tatum and Peter B. Logan as Amici Curiae on behalf of Defendant and Appellant.

Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, Harry F. Wartnick, Steven M. Harowitz and Daniel U. Smith for Plaintiffs and Respondents.

OPINION

WERDEGAR, J.—Plant Insulation Company (Plant) appeals from a judgment against it and in favor of Evea Merle Williamson, individually and as special administrator of the estate of Wash Chapel Williamson, for $1,067,041.90 in damages arising from Wash Williamson's exposure to asbestos-containing products distributed by Plant. We reverse in part and affirm in part.

FACTS

*Wash Williamson's Employment, Exposure and Illnesses*

Wash Williamson worked at the Chevron refinery in Richmond from 1947, the same year he married Evea Williamson, until 1982, first as a laborer, then as a helper, a boilermaker welder, and finally as a head mechanic and field construction supervisor. From 1947 until 1977, he was frequently exposed to airborne asbestos fibers from insulation used in the refinery, including products distributed and installed by Plant.

In 1977, Williamson was diagnosed with asbestosis and asbestos-related pleural disease. He underwent a lung operation and was off work for six months. Upon his return, he continued working as a head mechanic but avoided asbestos and areas with a great deal of dust. According to a longtime coworker, he was assigned to be head mechanic over tank crews, working in the refinery but avoiding "the mainstreams, the real heavy hard rushing periods we'd go through." Williamson also worked in this period as a field construction supervisor, overseeing contractors' construction.

Williamson retired from Chevron in 1982 at the age of 59. He would have liked to work until age 62 or 65, but quit earlier in order to get away from

"all the dust, asbestos, fumes and everything." Williamson testified he then began selling real estate full time (he had sold it part time while still working at Chevron).[1]

Williamson began feeling ill in 1989 and could no longer work. He was diagnosed with lung cancer in March or April 1990 and died during the trial of this action on February 16, 1991.

*Procedural Background*

The action was filed August 2, 1990, and came to trial on January 23, 1991. On defense motion, and over plaintiffs' objection, the trial was ordered bifurcated, with issues of statute of limitations, causation and damages to be tried in the first phase, and issues of liability and comparative fault in the second.

The jury returned its first-phase special verdict on February 7, 1991, finding the claim for damages from asbestosis was timely (no issue was presented as to timeliness of the claim for damages from lung cancer) and exposure to asbestos was a legal cause of plaintiffs' loss. The jury found the total damages to be: for Wash Williamson's asbestosis, $8,020.90 in economic damages, $150,000 in noneconomic; for Wash Williamson's lung cancer, $139,050 economic, $1 million noneconomic; and for Evea Williamson's loss of consortium, no economic damages, but $200,000 in noneconomic damages.

On February 8, the parties held an unsuccessful settlement conference. Trial of the second phase began Monday, February 11. On Friday, February 15, both parties rested except for introduction of an anticipated stipulation and ruling on and admission of exhibits. Court was recessed to Tuesday, February 19.

As noted, Wash Williamson died the next day, Saturday, February 16. Plaintiffs' counsel so informed the court and opposing attorneys on the morning of February 19, out of the jury's presence. The court indicated its intent to complete the trial and allow the jury to begin deliberating without telling them of Williamson's death, while deeming all objections timely made. Counsel for Plant did not specifically object to this procedure, but asked the court to strike or in some other manner eliminate the noneconomic damages included in the first-phase verdict for Wash Williamson. Counsel emphasized Plant wished to preserve its objections and "does not wish to

---

[1]Although Williamson testified (by deposition) he sold real estate fulltime after retirement, Evea Williamson testified it was only parttime and he earned only about $5,000 per year.

proceed to verdict" and also asked for a mistrial. Also on February 19, Evea Williamson was appointed special administrator of her late husband's estate for the purpose of prosecuting the lawsuit.

The jury was instructed and heard argument on February 19 and 20. During jury argument and deliberations, exhibits were moved into evidence, and objections were made, argued and ruled on by the court. The jury reached its phase-two special verdicts on February 21, finding Plant liable on product-defect and negligence theories, rejecting a defense of assumption of the risk as to lung cancer, and assigning comparative fault as follows: for asbestosis and pleural disease, 16 percent to Plant, 84 percent to other unspecified persons or entities; for lung cancer, 12 percent to Plant, 18 percent to Wash Williamson, and 70 percent to unspecified others.

After overruling defense objections based, inter alia, upon the effect of Wash Williamson's death, the court ultimately entered judgment on the special verdicts, reducing the damages only for comparative negligence and setoffs for prior settlements. Judgment was entered on February 19, 1992, nunc pro tunc as of February 15, 1991, the day before Wash Williamson's death.

## DISCUSSION

### I. *The Noneconomic and Future Economic Damages Did Not Survive Williamson's Death*

Probate Code former section 573, subdivision (c) (hereafter section 573(c)) provided at the time of trial: "Where a person having a cause of action dies before judgment, the damages recoverable by his or her personal representative are limited to the loss or damage the decedent sustained or incurred prior to death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived but not including any damages for pain, suffering, or disfigurement." (West's Ann. Prob. Code (1991 ed.) § 573, p. 263.)[2]

Relying primarily on section 573(c), Plant contends the court erred in entering judgment on the jury's award of Wash Williamson's noneconomic damages. This case, Plant maintains, comes squarely within the statute, as Williamson died "before judgment." Plant argues the court, by entering judgment nunc pro tunc as of the day before his death, improperly

---

[2]The provisions of section 573(c) have been continued without relevant change in Code of Civil Procedure section 377.34, added in 1992. (Stats. 1992, ch. 178, § 20.)

circumvented the intended effect and policy of the statute, to wit, that an estate should not be enriched by compensation for suffering that was personal to the decedent, not suffered by the estate or its beneficiaries.

Plaintiffs, on the other hand, maintain the entry of judgment for the noneconomic damages was proper either under common law precedent allowing entry nunc pro tunc when a party dies after the close of evidence but before judgment is rendered, or under Code of Civil Procedure section 669 (hereafter section 669), which provides: "If a party dies after trial and submission of the case to a judge sitting without a jury for decision or after a verdict upon any issue of fact, and before judgment, the court may nevertheless render judgment thereon."

In our view, neither the common law power of nunc pro tunc entry nor section 669 allowed the trial court to rescue Wash Williamson's pain and suffering damages from abatement under section 573(c). Williamson died *during*, not after, trial; although the live testimony had been completed, evidentiary exhibits had still to be admitted or excluded, instructions to be given, and jury argument to be made. Nor had the trial reached the stage of a jury verdict upon which judgment could be entered.

█ Plaintiffs first urge affirmance on the ground section 669 allows judgment to be rendered when a party dies after "a verdict upon any issue of fact." The phase-one special verdict, they assert, was such a verdict; hence, the plain language of section 669 authorizes a judgment on it, including noneconomic damages. The plain language of section 669, however, also refers to rendering a judgment "thereon," i.e., on the verdict already returned, necessarily implying the verdict is of a type upon which a judgment can properly be entered. The phase-one special verdict—which established only timeliness, the causative link between asbestos and Williamson's illnesses, and the total damages suffered—was manifestly not of that type. In that verdict, the jury was not asked to determine anything about Plant's liability; indeed, Plant's name does not even appear on the verdict form. No judgment against Plant could be rendered on such a verdict. (See *Lauderdale v. U & I Equip. Co.* (1969) 271 Cal.App.2d 140, 142-143 [76 Cal.Rptr. 483] [in bifurcated trial, judgment may not be entered on a first (liability) phase verdict for the plaintiff].)

It appears extremely unlikely the phrase "a verdict upon any issue of fact" in section 669 refers to a verdict in one phase of a bifurcated trial. Section 669 derives from section 202 of the 1851 Practice Act, which used the language "a verdict or decision upon any issue of fact." (Stats. 1851, ch. 5, § 202, p. 82.) The statute authorizing bifurcation, Code of Civil Procedure

section 598, was not added to the code until 1963. (Stats. 1963, ch. 1205, § 1, pp. 2705-2706.) Moreover, an early case construing the Practice Act provision makes clear the statute referred to a verdict determining *all* the facts necessary for judgment: "A third class of cases was provided for by Sec. 202 of the Practice Act, those in which a party should die after verdict and before judgment. In such cases the court was directed to render a judgment on the verdict, and *the judgment was but the formal entry of the result of the litigation—the demand of the successful party having been liquidated and established by the verdict.*" (*Estate of Thomas S. Page* (1875) 50 Cal. 40, 42, italics added.) At the time of Wash Williamson's death, his claim had not in any sense yet been liquidated or established, as there was no verdict determining Plant's liability.

▮ Second, plaintiffs contend the noneconomic damages survived because the court properly entered the judgment nunc pro tunc as of a time before Wash Williamson's death. This approach must also be rejected. The cases establishing the power of nunc pro tunc entry extend it back only to a time when judgment could or should have been rendered. The proceedings here had not reached that stage when Wash Williamson died.

▮ "The general rule is that 'courts have inherent power to enter judgments *nunc pro tunc* so as to relate back to the time when they should have been entered, but will do so only to avoid injustice.' (*Phillips* v. *Phillips* [1953] 41 Cal.2d 869, 875 [].)" (*Young* v. *Gardner-Denver Co.* (1966) 244 Cal.App.2d 915, 919 [53 Cal.Rptr. 522].) "A court will always exercise this authority when it is apparent that the delay in rendering the judgment, or a failure to enter it after its rendition, is the result of some act or delay of the court, and is not owing to any fault of the party making the application. . . . '[W]here the delay in rendering a judgment or a decree arises from the act of the court—that is, where the delay has been caused either for its convenience, or by the multiplicity or press of business, through the intricacy of the questions involved, or of any other cause not attributable to the laches of the parties—the judgment or the decree may be entered retrospectively as of a time when it should or might have been entered up.'" (*Fox* v. *Hale & Norcross S. M. Co.* (1895) 108 Cal. 478, 480-481 [41 P. 328], quoting *Mitchell* v. *Overman* (1880) 103 U.S. (13 Otto) 62, 64-65 [26 L.Ed. 369, 370-371].)

"Where the party is not at fault, the determinative consideration moving the court is whether or not the action at the death of the party was ready for rendition of final judgment. When the state of the record . . . show[s] that a suitor was entitled to a particular judgment but that the judgment was not entered when it might have been, such judgment may subsequently be entered so as to relate back to the time when it should have been entered,

providing the delay was not occasioned by the party applying." (*Norton* v. *City of Pomona* (1935) 5 Cal.2d 54, 62 [53 P.2d 952].)

██ None of these descriptions of the power to enter judgment retrospectively supports the action of the trial court here. Although plaintiffs were not at fault for the length of the trial, the fact remains the case was not ready for rendition of judgment, or even close to that point, when Wash Williamson passed away. The evidentiary stage of trial had not quite been completed, the jury had not been instructed, the attorneys had not presented their summations, and, of course, there had been no verdict upon which judgment could be entered.

Nor are the decisions relied upon by plaintiffs upholding nunc pro tunc judgments factually comparable to the instant case. In *Estate of Pillsbury* (1917) 175 Cal. 454, 460 [166 P. 11, 3 A.L.R. 1396], the trial (to the court after a jury waiver) of a medical malpractice suit "was had and concluded" two days before the defendant's death. Ignorant of the death, the court entered its judgment two days afterward, but later entered the same judgment nunc pro tunc "as of the day of the submission of the cause for determination." In *Leavitt* v. *Gibson* (1935) 3 Cal.2d 90 [43 P.2d 1091], an action for fraud in the sale of real property was tried to the court and argued by written briefs. The defendant died before the plaintiffs' reply brief, which was overdue, was filed. (*Id.* at pp. 92-93, 106.) In affirming a judgment entered retrospectively as of a date before the defendant's death, the Supreme Court stated: "There can be no doubt in the instant case that a final judgment could have been entered at the close of the evidence and surely on the date that the plaintiff's [*sic*] time for filing the closing brief expired." (*Id.* at p. 107.) Finally, in *Norton* v. *City of Pomona, supra,* 5 Cal.2d at pages 57-58, the nonjury trial of a personal injury action had been completed, and a minute order made giving judgment for plaintiffs, before one of the plaintiffs killed himself.

All of these decisions involved nonjury trials in which the cause had either been submitted for judgment, or was in a state ready for judgment, at the time the party died. They do not support backdating the judgment in a case tried to a jury to a time when all the evidence had not yet been introduced and the jury had heard neither instructions nor argument.

██ Plaintiffs also suggest nunc pro tunc entry was proper here because Plant, upon whose motion the trial was bifurcated, was responsible for delaying judgment until after Wash Williamson's death. The record, however, fails to support their claims in this regard. First, bifurcation was not "strenuously opposed by Mr. Williamson's counsel on the grounds that

bifurcation would delay the trial . . . ." Counsel did at one time state bifurcation "may take longer," but later argued "[t]he savings that we might experience as a result of bifurcating, if there is any savings, is a matter of a day or two and given the plaintiff's health, we would suggest bifurcation should not be used in this case." (Counsel's "most important" objection was the possibility unconscientious jurors would be tempted to cut their service short by returning a first-phase defense verdict.) Second, there is no way of knowing from this record whether bifurcation actually delayed or speeded the trial. Factors such as more efficient organization of evidence, more focused and less numerous jury instructions, more cogent argument and more manageable deliberations may make bifurcation the faster procedure even when it requires some witnesses to appear twice. Third, there is no showing Plant acted in bad faith in failing to make a settlement counteroffer during the conference between the two trial phases on February 8, 1991. Defense counsel's posttrial declaration, to the effect that Plant made no counteroffer because it viewed plaintiffs' $1 million-plus demand as "grossly out-of-line" with its comparative fault, is not inherently implausible, given that the court had not yet ruled on whether Proposition 51 applied. Nor does the record show defense counsel knew Wash Williamson was within days of death. This case, therefore, does not present the question whether nunc pro tunc entry of a judgment is a proper remedy when a defendant deliberately delays trial so as to ensure the plaintiff will die before judgment can be rendered.

 A rule of law that requires noneconomic damages found by a jury to be reversed because the plaintiff died a few days before his trial could be completed may appear somewhat arbitrary. Certainly there is no reason to believe the defense was prejudiced in its conduct of the trial by Williamson's untimely passing. Indeed, this whole trial could well have been conducted after Williamson's death without anything being done differently—because of his illness, Williamson did not attend the trial and testified only by deposition. Nonetheless, a line must be drawn if section 573(c) is to have any effect at all, and in that section, the Legislature drew a clear line: noneconomic damages do not survive if the plaintiff dies before judgment.[3] The cases on nunc pro tunc entry of judgment push that line back a short distance, to the time when judgment *could* have been rendered even if it was not. That movement rests on a sound rationale—that a party should not suffer from the court's own delay in giving judgment—and it would be neither wise nor within our authority to erase the line thus drawn.

---

[3]Of course, the arbitrariness of the bright line can also work to the plaintiff's advantage. The plaintiff who receives a large award for pain and suffering and dies the day after judgment is entered passes that award on to his or her estate, despite the fact the estate did not endure the pain and suffering and, if the policy of section 573(c) were to be enforced with strict logic, should not be compensated for it.

Our conclusion requires the judgment be reversed insofar as it awarded damages for Wash Williamson's pain and suffering.[4]

■ In addition, Plant claims the jury awarded damages for Wash Williamson's future economic losses, and these should also be stricken. Under section 573(c), damages not incurred prior to death are not recoverable in the decedent's action. From the record on appeal, however, we are unable to determine what amount, if any, the jury awarded in anticipated economic damages, or what portion of these might actually have been suffered prior to Williamson's death. In his summation, plaintiffs' counsel requested economic damages for lung cancer totalling $164,103.41 (although counsel told the jury they rounded off to $163,000). These included $80,000 in anticipated economic loss. No future economic damages were requested for asbestosis. The jury, however, awarded only $139,050 in economic damages for lung cancer, and their verdict did not break off future from past losses. All that can be said from this record is that the jury did not give Williamson everything he asked for in economic damages and that its award probably did include some amount of anticipated future losses. There is also no record of what losses Williamson actually incurred between the time of this verdict and his death. Consequently, the judgment awarding economic damages must also be reversed.[5]

II. *Substantial Evidence Supports the Jury's Finding the Asbestosis Claim Was Timely*

■ The Legislature has made special provision for determining the timeliness of claims for asbestos-related illness. Code of Civil Procedure section 340.2 (hereafter section 340.2), subdivision (a) makes such a claim timely if brought within the *later* of two periods: (1) within a year after the date the plaintiff first suffered "disability"; and (2) within a year after the plaintiff knew, or should have known, the disability was due to asbestos exposure. Subdivision (b) defines "disability" as "the loss of time from work as a result of such exposure which precludes the performance of the employee's regular occupation."

A further gloss on "disability" as used in this statute was provided in *Puckett* v. *Johns-Manville Corp.* (1985) 169 Cal.App.3d 1010 [215 Cal.Rptr.

---

[4]Having concluded the noneconomic damages must be stricken, we need not address Plant's additional contention its liability for noneconomic damages should have been limited, under Civil Code section 1431.2 (Proposition 51), to a share proportional to its comparative fault.

[5]We express no opinion as to the proper measure of economic damages incurred during Wash Williamson's lifetime, including the question whether loss of future earning capacity is an element of such damages.

726], which held it referred "to a permanent termination of an individual's capacity to perform the tasks involved in his or her regular occupation rather than to some temporary interference with that capacity." (*Id.* at p. 1017.) It has also been held that under section 340.2, the statute of limitations will never begin to run for a plaintiff who was not an "employee," i.e., who was not part of the labor force or who retired before the onset of what would otherwise have been a disability. (*Duty* v. *Abex Corp.* (1989) 214 Cal.App.3d 742, 748-753 [263 Cal.Rptr. 13].)

The jury, which was fully instructed on these principles, found the action was timely brought. Their finding is supported by substantial evidence. Williamson's incapacitation in 1977 was not permanent; after six months, he returned to work. He retained his job classifications and titles of head mechanic and field construction supervisor. While Williamson admitted his duties were "limited" after he returned, the only limitations he testified to were that he not work around asbestos or very dusty areas, and that if a physical activity hurt, to stop doing it.[6] There was testimony from coworkers that Williamson continued to perform the duties of a head mechanic, albeit over tank crews, and that a short time after his return to work he was "all over the refinery." The jury could reasonably find Williamson was not "preclude[d]" from performing his "regular occupation." (§ 340.2, subd. (b).)

Nor was the jury required to find Williamson retired in 1982 because he had suffered "disability" within the meaning of section 340.2. In context, Williamson's statement his retirement was not "voluntary" can be understood as meaning merely that, had he not been advised to get away from the dust, fumes and asbestos, he would have worked at Chevron a few years longer. That he made a choice based in part on medical advice does not compel a finding he was medically precluded from continuing in his regular occupation.

*Uram* v. *Abex Corp.* (1990) 217 Cal.App.3d 1425 [266 Cal.Rptr. 695], upon which Plant relies, is easily distinguishable. There, the plaintiff had

---

[6]According to an "Employee Physical Limitation Record" dated July 25, 1977, Williamson was not restricted from any physical activities, but could not work around asbestos, dust, smoke or other respiratory irritants. Plant's brief also cites us to three doctors' reports from 1978 which, Plant concedes, were not before the jury when the statute of limitations issue was decided in the first phase of trial. They are therefore irrelevant to the question of substantial evidence. In any event, the reports would not have compelled a different factual finding: they contain Williamson's statements he had switched to using his left arm for lifting and pushing because he experienced pain using his right; he had had shortness of breath and fatigue; his shortness of breath was not, as far as he could tell, exacerbated by changes in the weather or contact with dust; and he was unable to climb ladders.

received a disability retirement in 1959 because, in his own words, " 'I couldn't perform my duties so I was compelled to leave.' " He worked intermittently as a gardener until 1965. (*Id.* at p. 1431.) Not surprisingly, the appellate court held he was precluded from his regular occupation in 1959 and from any occupation after 1965. (*Ibid.*) In contrast, here there was substantial evidence Williamson retired by his own choice to pursue another occupation, selling real estate.

◼ Plant also contends the jury was misled or confused by the instruction, based on *Duty* v. *Abex Corp., supra,* 214 Cal.App.3d 742, that a person who retired for reasons other than disability could not later become "disabled" within the meaning of section 340.2.[7] Plant does not argue *Duty* was incorrectly decided, but that its holding was inapplicable here and resulted in the jury focusing on when Williamson was disabled from selling real estate because of his lung cancer, rather than when he was disabled from his regular occupation at Chevron because of his asbestosis. We disagree. The instruction was warranted by the evidence; the jury could reasonably have found Williamson was not disabled at the time he retired from his regular occupation at Chevron, which under the *Duty* analysis would imply the statute never began to run. Moreover, the instructions were clear and explicit that disability occurred when the employee was unable to perform his "regular occupation." What Williamson's "regular occupation" was, and when, if ever, he was disabled from pursuing it, were questions for the jury. Contrary to Plant's assertion, the instructions did not imply or suggest preclusion from "*any* occupation" was required.

### DISPOSITION

The judgment is reversed insofar as it includes: (1) an award of noneconomic damages to the estate of Wash Williamson; and (2) an award of anticipated economic damages to the estate of Wash Williamson. The cause is remanded to the trial court for a limited new trial on the amount of economic damages suffered by Wash Williamson in his lifetime due to lung cancer. The judgment is otherwise affirmed. The parties are to bear their own costs on appeal.

White, P. J., and Chin, J., concurred.

A petition for a rehearing was denied April 29, 1994, and respondents' petition for review by the Supreme Court was denied June 16, 1994. Werdegar, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.

---

[7]As made clear in the reply brief, Plant does not challenge the instruction that section 340.2 begins to run only with *permanent* disability.