[No. A077665. First Dist., Div. Two. Aug. 12, 1999.]

ROBERT H. OVERLY et al., Plaintiffs and Respondents, v.
INGALLS SHIPBUILDING, INC., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.A., III.B. and III.D.

**COUNSEL**

Sedgwick, Detert, Moran & Arnold, Roger W. Sleight, Frederick D. Baker and Charles T. Sheldon for Defendant and Appellant.

Law Offices of Daniel U. Smith, Daniel U. Smith, Ted W. Pelletier; Wartnick, Chaber, Harowitz, Smith & Tigerman, Harry F. Wartnick and Stephen M. Tigerman for Plaintiffs and Respondents.

## OPINION

## HAERLE, J.—

### I. INTRODUCTION

Robert and Louise Overly (the Overlys) sued Ingalls Shipbuilding, Inc. (Ingalls) and others for personal injury and loss of consortium resulting from Robert's exposure to asbestos. A jury found Ingalls and another defendant, Avondale Industries, Inc. (Avondale), guilty of negligence and awarded the Overlys substantial damages. In this appeal,[1] Ingalls argues: (1) the trial court made erroneous evidentiary rulings which mandate reversal of the judgment; (2) Ingalls was denied a fair trial because the jury was not given evidence pertaining to defendants who did not participate at trial; (3) the trial court erred by allowing the Overlys to recover future economic damages for the period of Robert Overly's shortened life expectancy; and (4) the trial court's allocation of prior settlements between this case and a prospective wrongful death case was erroneous.

We reject each of Ingalls's arguments and affirm the judgment.

### II. STATEMENT OF FACTS

#### A. *Background*

Robert H. Overly (Robert) was born in 1922 and married Louise in November 1949. They have two adult daughters. In January 1996, Robert was diagnosed with mesothelioma, a cancer of the lining of the lung that is most often caused by exposure to asbestos. In April 1996, the Overlys filed their complaint against numerous defendants, including Ingalls. Relying on theories of negligence and strict liability, the Overlys sought damages for personal injury and loss of consortium allegedly caused by Robert's almost 40 years of exposure to asbestos at various locations where he worked. The defendants were allegedly liable either because they manufactured and/or distributed the asbestos which caused Robert's injury or because they owned or otherwise controlled the premises where Robert was exposed to asbestos. Ingalls was one of the "premises defendants."

---

[1]The Overlys' appeal was dismissed pursuant to their request. Avondale is not a party in this cross-appeal.

B. *The Case Against Ingalls*

The Overlys' claims against Ingalls are based on Robert's asbestos exposure while he was employed by Westinghouse to work on ships under construction at Ingalls's shipyard in Pascagoula, Mississippi. Their general theory of negligence is that Ingalls knew or should have known about the dangers of asbestos and nevertheless exposed Robert to those dangers without providing any warning or protection.

1. *Exposure and causation*

In 1948, Robert began working for Westinghouse as a field service engineer. His job was to supervise the installation of turbines, generators and other equipment manufactured by Westinghouse that was installed in ships, industrial plants and powerhouses. Robert left Westinghouse in 1957 for other employment, but returned in 1960. From 1960 to 1964, he was assigned to Westinghouse's South Philadelphia plant and spent approximately 25 percent of his time doing field work at shipyards, including Ingalls. Robert recalled that he made several visits to the Ingalls shipyard during that period to service ships that were located there. During the period 1964-1967, Robert worked out of Westinghouse's Sunnyvale, California, office and recalled making two trips to the Ingalls shipyard. During each trip, Robert spent two to three days working on ships along with the service engineers.

In 1967, Robert was promoted to port engineer for the Gulf Coast area. In that capacity, Robert was the customer contact for maritime operators and shipyards. While performing this job from 1967 to 1969, Robert spent most of his time working on ships and at shipyards. He estimated that he spent a total of 25 percent of his time during this two-year period working at the Ingalls shipyard. In 1969, Robert was transferred back to the Sunnyvale office and promoted to manager of the service department. At that point, he spent approximately 20 percent of his time doing field work. He recalled making at least one trip to the Ingalls shipyard in the mid-1970's. Robert retired from Westinghouse in January 1984.

As a Westinghouse employee, virtually all of the work Robert did aboard ship was in the engine room where the turbines and gears that Westinghouse manufactured were installed. It was "very common" for Robert to work alongside the insulation workers who also spent significant time working in the engine rooms of ships. The insulators generated significant amounts of dust. They worked in confined areas alongside many other tradesmen. Robert's experience at various ships and shipyards was consistent in that,

during a certain point in the construction of a ship, conditions were noisy, dirty and a lot of insulation work was being done. Robert recalled that, with regard to almost every ship he worked on, when construction was in full swing, his clothes, hands, face and even nostrils would be coated with dust.

During the 1960's, insulators regularly used several types of asbestos insulation products including pipe covering, block insulation, cement and tape. Robert often observed insulators cut and apply molded asbestos to pipes. Insulation work generated visible amounts of asbestos dust. Post-insulation cleanup work generated additional dust. Further, the process of installing and testing turbines, in which Robert was directly involved, could disturb the insulation in the engine and fire rooms of the ships and create more dust. Robert recalled occasions when he would leave shipyards "covered like a snowman" with dust.

Robert testified he did not know the insulation dust he was exposed to at the Ingalls shipyard could harm him. Nobody at Ingalls warned him the dust was dangerous or ever offered him a mask or respirator. A defense witness who worked at Ingalls during the relevant time confirmed that insulation workers were not offered or required to wear respirators at Ingalls during the 1960's. George Bryan, Ingalls's safety director at the relevant time, testified that shipyard workers were not required to wear respirators but they were available when conditions were dusty.

The Overlys presented evidence that there is no safe level of exposure to asbestos, and that even an extremely low exposure can cause mesothelioma. There was also evidence that the risk of contracting this disease grows in proportion to the amount of asbestos to which the individual is exposed. The Overlys' expert testified that Robert's "most intense" asbestos exposure occurred in the engine rooms of ships.

### 2. Knowledge of danger

The Overlys offered several types of evidence to prove that Ingalls knew or should have known about the hazards of asbestos at the time Robert worked on ships at the Ingalls shipyard. Their expert, Dr. Barry Castleman, documented the growing awareness of risks of asbestos exposure beginning with acknowledgements by the medical community as early as the 1890's.

The Overlys particularly relied on a 1964 report by Dr. Irving Selikoff about the dangers of asbestos exposure to insulation workers. Selikoff's findings were reported not just to the medical community but to the general public as well. His study was discussed in the New York Times and other

newspapers. Ingalls's defense expert, Dr. William Hughson, admitted that Selikoff received publicity "not only in medical circles, but in popular circles, public circles." He conceded that by 1965 it was "evident" that insulators were developing disease as a result of their exposure to asbestos.

George Bryan, Ingalls's former safety director, admitted that, by 1960, asbestos was identified in federal government safety and health regulations as having hazardous characteristics. Bryan admitted he had access to these regulations when he began working in the safety department in 1961. But, he could not recall when he came to actually know asbestos was hazardous. Bryan conceded that the harmful effects of asbestos were discussed at a meeting he attended in 1968.

The Overlys also attempted to prove Ingalls was aware of the hazards of asbestos by as early as 1942. They introduced evidence that, in December of that year, the United States Maritime Commission held a meeting to discuss the minimum requirements for industrial heath and safety at shipyards. Among the topics discussed was the hazards of asbestos being used at shipyards. The minutes of that meeting reflect that two representatives of Ingalls were present and that one of these men spoke during the meeting. In January 1943, the Maritime Commission published a document titled "Minimum Requirements for Safety and Industrial Health in Contract Shipyards." The document contained a "Guide for Prevention of Industrial Disease in Shipyards" which set forth recommendations for the safe use of asbestos. Asbestosis was identified as a common disease in shipyards and recommendations were made for prevention including segregation of dusty work, ventilation and use of respirators.

Ingalls relied on George Bryan's testimony to establish that Ingalls acted reasonably and did not know, at the relevant time, of the risks of exposure to asbestos. Bryan joined Ingalls's safety department in 1961 and was in charge of that department from 1963 to 1970. Bryan testified that safety standards for shipyards were established by the "Walsh-Healey Act" and were mandatory. In addition, Ingalls had its own safety manual. Bryan claimed that these rules and regulations were enforced during his tenure at the safety department. The Department of Labor was responsible for enforcing Walsh-Healey regulations. Bryan recalled discussing "nuisance dust" during government inspections of the shipyard. However, he was not aware of any citation issued to Ingalls for violating a Walsh-Healey regulation pertaining to dust control.

C. *The Verdict and Apportioning of Liability*

When the case was submitted to the jury, two defendants were participating in the trial, Ingalls and Avondale, another shipyard owner. The jury

found both defendants guilty of negligence. Pursuant to a special verdict form, the jury found that Robert suffered $465,000 in economic damages and $400,000 in noneconomic damages and that Louise suffered $25,000 in damages for loss of consortium. Fault was apportioned 4 percent to Ingalls, 10 percent to Avondale, 50 percent to Westinghouse, and 36 percent to "all others." The jury also specifically found that Robert suffered appreciable harm from his exposure to asbestos prior to June 4, 1986, the operative date for Proposition 51.[2]

Judgment was entered on December 3, 1996. Two days later, the trial court held a hearing to determine what portion of prior settlements would be applied to reduce the judgment. The Overlys' counsel presented a declaration disclosing that prior settlements in the case totaled $555,856. The trial court allocated 50 percent of the prior settlements to the present personal injury action and the other 50 percent to a potential wrongful death case.[3] Applying Proposition 51, the court reduced Robert's economic damages by $144,523, representing 52 percent of $277,928, the portion of the prior settlement figure applicable to the present action, leaving a balance of $320,477. The court entered an amended judgment holding Ingalls and Avondale jointly and severally liable for $320,477. The amended judgment also holds Ingalls liable for 4 percent of Robert's noneconomic damages ($16,000), and 4 percent of Louise's loss of consortium damages ($1,000). It further provides that, every six months for two years, the Overlys' counsel must notify defendants of additional postverdict settlements and that such settlements will be credited against the judgment.

### III. DISCUSSION

A., B.*

. . . . . . . . . . . . . . . . . . . . . . . .

[2]Proposition 51 is codified at Civil Code section 1431.2. Subdivision (a) of that section provides: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."

[3]Mesothelioma is an incurable, fatal disease. Thus, a wrongful death action has been anticipated throughout this case. The record confirms that Robert was alive when judgment was entered. However, Ingalls's reference in its opening brief to a wrongful death action filed by Robert's heirs suggests that Robert has now passed away.

*See footnote, *ante*, page 164.

## C. *Future Economic Damages*

 The trial court permitted the Overlys to introduce evidence of and seek recovery for loss of future economic benefits that Robert would have earned during the period by which his life expectancy was shortened, i.e., "lost years" damages, in the form of pension, Social Security and "household services" benefits.[5] Then, the court precluded Avondale's counsel from questioning the Overlys' expert about expenses the Overlys would have incurred during the lost years period. Ingalls contends both rulings were error.

### 1. *Lost years damages*

Ingalls argues the Overlys were not entitled to recover damages for Robert's prospective earnings during the lost years because these damages had not yet "accrued" at the time of trial and, indeed, would not accrue until after Robert's death, at which time his heirs could claim the benefits as loss of support. We reject this argument for two independent reasons.

First, we agree with the Overlys that Ingalls waived this complaint by failing to preserve the issue below. During a hearing on *in limine* motions, the Overlys' counsel argued that plaintiffs were entitled to recover, as damages, income Robert would have earned if not for his shortened life expectancy, and that such damages included lost Social Security and pension benefits. After counsel set forth his theory, the court asked if any defendant disagreed with it or had any objection. Nobody did.[6]

Ingalls argues here that the "defendants objected to the evidence" during the trial testimony of Dr. Peter Formuzis. Dr. Formuzis was the Overlys'

---

[5]Although the parties do not distinguish between the different types of lost years damages that were awarded, we note that lost household services damages are different than the other types of future earnings included in this category. Generally, household services damages represent the detriment suffered when injury prevents a person from contributing some or all of his or her customary services to the family unit. (Cal. Tort Damages (Cont.Ed.Bar 1988) § 1.64, p. 44.) The justification for awarding this type of damage as part of the loss of future earnings award is that the plaintiff should be compensated for the value of the services he would have performed during the lost years which, because of the injury, will now have to be performed by someone else. It could also be argued that limiting household services damages to the period of actual life expectancy would grant the defendant a windfall for shortening a plaintiff's life as opposed to permanently disabling him.

[6]At oral argument, Ingalls's counsel represented to this court that Avondale's trial counsel, Mr. Wah, did object during the hearing. However, Mr. Wah's objection was not that the Overlys could not recover lost years damages, but rather that there might be a double recovery in a wrongful death case. After further discussion on this issue, including assurances from the Overlys' counsel that no double recovery would occur, Mr. Wah expressly told the court that he was "inclined" to say he no longer had an objection.

economic damages expert. Our review of the record discloses that Ingalls's counsel did not object to any of Dr. Formuzis's testimony. When Dr. Formuzis was explaining the concept of damages for the value of Robert's lost ability to perform household services, counsel for Avondale raised a "belated" objection that future damages to Louise because of this loss were not relevant. This belated objection did not preserve the very different issue Ingalls now raises, i.e., whether this type of damages is recoverable at all.

Second, even if the issue were preserved for appeal, the lost years damages award is consistent with relevant authority. (*Fein* v. *Permanente Medical Group* (1985) 38 Cal.3d 137, 153 [211 Cal.Rptr. 368, 695 P.2d 665] (*Fein*); see also *Hurlbut* v. *Sonora Community Hospital* (1989) 207 Cal.App.3d 388, 405 [254 Cal.Rptr. 840].) *Fein* was a medical malpractice action based on the defendants' alleged failure to diagnose the plaintiff's heart condition prior to his suffering a heart attack. On appeal from a judgment entered against it, one defendant argued the trial court erred by permitting the jury to award the plaintiff damages for "the loss of earnings attributable to plaintiff's so-called 'lost-years,' i.e., the period of time by which his life expectancy was diminished as a result of defendant's negligence." (*Fein, supra*, 38 Cal.3d at p. 153.) Rejecting this argument, our Supreme Court stated: " 'Under the prevailing American rule, a tort victim suing for damages for permanent injuries is permitted to base his recovery "on his prospective earnings for the balance of his life expectancy at the time of his injury *undiminished by any shortening of that expectancy as a result of the injury*." [Citation.]' " (*Ibid.*)

Ingalls argues *Fein* is inapposite because that case involved future wage loss damages as opposed to future benefits like Social Security and pension benefits. But Ingalls fails to explain how this distinction is relevant. *Fein* expressly recognized a right to recover damages for the loss of prospective *earnings* during the period of time by which the plaintiff's life expectancy has been diminished. (*Fein, supra*, 38 Cal.3d at p. 153.) Wage related benefits such as Social Security and pensions are certainly earnings. Further, contrary to Ingalls contention, Robert's right to these earnings did accrue prior to death; he earned that right by working. And his inability to collect these benefits during the lost years is a direct result of the injury which shortened his life expectancy.

Ingalls claims its argument is supported by *Williamson* v. *Plant Insulation Co.* (1994) 23 Cal.App.4th 1406, 1418 [28 Cal.Rptr.2d 751], which states that "damages not incurred prior to death are not recoverable in the decedent's action." Ingalls argues the trial court violated the rule of *Williamson* by "allowing plaintiffs to characterize as damages in their personal injury

case economic losses that were certain not to accrue until Overly passed away." The rule Ingalls extracts from *Williamson* is not relevant to this case because this is not "a decedent's action." *Fein* establishes the right to recover lost years damages in a personal injury action.

Ingalls also argues that permitting the Overlys to recover future economic damages in this case will result in a double recovery because the same damages are currently being sought in a wrongful death case that Robert's heirs have filed. There is no evidence in the record to support this contention. Further, the *Fein* court rejected this precise argument for the simple reason that "an appropriate setoff may be made in the later wrongful death action. [Citation.]" (*Fein, supra,* 38 Cal.3d at p. 154.) Indeed, in the present case, the Overlys' trial counsel expressly acknowledged that these damages may only be recovered once.

In its reply brief, Ingalls cites *Monias* v. *Endal* (1993) 330 Md. 274 [623 A.2d. 656] (*Monias*), to support its claim that the lost years damages award was improper in the present case. *Monias* was a medical malpractice action against a gynecologist for failing to diagnose and treat the plaintiff's breast cancer. A jury found the doctor negligent and awarded substantial damages. The sole issue on appeal was whether the portion of the award attributable to "post premature death" damages was proper. (*Id.* at p. 279.) The *Monias* court adopted the "majority" rule that the plaintiff was entitled to recover her loss of earnings based on her life expectancy had the tortious conduct not occurred. (*Id.* at p. 281.) The court then considered the plaintiff's claim that it was improperly denied damages for the "loss of household services to [her] children" for the lost years period. (*Id.* at p. 283.) Affirming a lower court ruling, the *Monias* court found plaintiff was not entitled to recover damages for the value of services she would be unable to provide to her children during the lost years period. The court reasoned that the loss of services that the tort victim would not be able to provide to her children because of her shortened life expectancy was an injury incurred not by the tort victim but by her family. (*Id.* at pp. 283-285.)

To the extent *Monias* recognizes that a tort plaintiff may recover for lost earnings during the period by which her life expectancy has been cut short, the case affirmatively supports our conclusion on this issue. The *Monias* court's refusal to recognize a right of recovery for loss of services to children during that period does not affect our analysis in the present case because that specific issue is not presented to us here. Ingalls has not challenged the propriety of awarding loss of services damages in particular but, instead, has made a general attack on all of the lost years damages awarded in this case. Indeed, Ingalls cites *Monias* as alleged support for its

argument that all of the lost years damages claimed in the present case did not begin to accrue until Robert's death. *Monias* does not discuss this "accrual" issue.

In our view, Ingalls's citation to *Monias* in its reply brief does not properly raise the distinct issue of whether awarding damages for loss of household services during the lost years was proper in this case. Even if it did, we would find that the issue is waived. ■ On appeal, a party cannot properly raise a new theory in a reply brief. (See, e.g., *Reichardt* v. *Hoffman* (1997) 52 Cal.App.4th 754, 763-766 [60 Cal.Rptr.2d 770]; *Stoll* v. *Shuff* (1994) 22 Cal.App.4th 22, 25 & fn. 1 [27 Cal.Rptr.2d 249]; *American Drug Stores, Inc.* v. *Stroh* (1992) 10 Cal.App.4th 1446, 1453 [13 Cal.Rptr.2d 432].)

### 2. *Personal consumption*

■ Ingalls argues that, even if Robert was entitled to damages for the loss of his future economic benefits, the future economic damage award should have been reduced to account for the Overlys' personal consumption during the lost years. Conceding there is no California authority on point, Ingalls argues that policy concerns compel this conclusion and that the trial court erred by excluding evidence of the Overlys' expected personal consumption.

As the trial court noted, the issue of whether lost years damages should be assessed on the basis of "net" loss was raised in *Fein*. (*Fein, supra*, 38 Cal.3d at p. 155.) The *Fein* court recognized there is some authority to support a "net" loss analysis but, ultimately, did not decide the issue because it was not preserved for appeal. (*Ibid.*) The "authority" referred to by the *Fein* court is a law review article by Professor John Fleming titled *The Lost Years: A Problem in the Computation and Distribution of Damages* (1962) 50 Cal.L.Rev. 598.) Professor Fleming advocates recovery of lost years damages in a personal injury action, but states that lost future earnings should be calculated on a "net" basis: "[T]he law does not pretend to go beyond compensation for the net loss incurred by a plaintiff, which, in this context, seems to be at most the difference between what he would have earned and what would be left to him after meeting the cost of the basic necessities of life and the expenditures, if any, involved in earning his living." (*Id.* at p. 603.)

Other commentators have argued that failing to adjust an award for loss of future earnings during the lost years to account for living expenses that would have been incurred during that time overcompensates the plaintiff.

(See 4 Harper et al., The Law of Torts (2d ed. 1986) Damages in Accident Cases, § 25.8, pp. 551-552, fn. 9; Comment, *The Measure of Damages for a Shortened Life* (1955) 22 U.Chi. L.Rev. 505, 511.) Nevertheless, the majority view is that no deduction is made for the injured party's expected living expenses during the lost years. (*Ibid.*; see, e.g., *In re Joint Eastern & Southern Dist. Asbestos Lit.* (E.D.N.Y. 1989) 726 F.Supp. 426, 428 (*Joint Asbestos Litigation*); *Burke* v. *United States* (D.Md. 1985) 605 F.Supp. 981, 989-990.) Although we note the absence of a completely satisfactory explanation for this rule,[7] we are inclined to follow it for two reasons.

First, as a general matter, applying a personal consumption deduction in this context would introduce undesirable elements of speculation and uncertainty into an already difficult calculation. For example, it is difficult to conceive how a defendant could prove the use that an injured plaintiff would have made of lost years earnings had his life expectancy not been cut short. It is equally hard for us to imagine how a defendant would distinguish the injured party's "personal" consumption from the consumption of dependents living with that injured party.[8]

The record in the present case reinforces our concerns. There is no indication that Avondale or Ingalls was prepared to present evidence to prove that Robert would have to have used any portion of his lost years earnings for his living expenses. Indeed, the personal consumption issue arose at trial only because Avondale's counsel attempted to cross-examine the Overlys' expert on this issue. Ingalls raised the issue again in its motion for a new trial, but never indicated it had any affirmative evidence of personal consumption that it was prevented from offering. Thus, in a case such as the present one, recognizing a personal consumption deduction would be equivalent to asking a jury to speculate about an injured plaintiff's prospective personal living expenses during the lost years period.

---

[7]The only explanation we have found for the rule is summarized in the following passage: "Calculating damages for lost earning capacity based on the victim's pre-injury life expectancy has been criticized as overcompensating the plaintiff, because no deductions are made for his or her living expenses between the time of projected actual death and the time death probably would have occurred had there been no injury. It has been viewed, however, as the 'lesser of two evils.' The alternative method of awarding damages based on the victim's shortened life expectancy would, in effect, reward the defendant for having successfully injured the plaintiff so severely as to curtail his or her life span, and would under-compensate plaintiff's dependents for the loss of support during those lost years. [Citations.]" (*Joint Asbestos Litigation, supra*, 726 F.Supp. at p. 428.) While these concerns explain why a plaintiff should be entitled to recover lost earnings for the period representing his shortened life expectancy, they do not explain why a living expense deduction can not or should not be employed.

[8]Ingalls does not even acknowledge this distinction in its appellate brief. It repeatedly states that damages should have been reduced to reflect "plaintiffs' " expected personal consumption. We can conceive of no basis for reducing the award to account for Louise's personal consumption during the lost years period.

Second, and equally troubling, Ingalls does not identify any case which applies a personal consumption or living expense deduction in this context. Ingalls argues that California applies such a deduction in wrongful death cases and that the same "logic" applies in this context. Ingalls does not articulate that "logic," and the authority it cites does not even establish that a defendant has a right to introduce evidence of personal consumption in a wrongful death case. (See *United States* v. *English* (9th Cir. 1975) 521 F.2d 63, 71-72; *Howard* v. *Crystal Cruises, Inc.* (9th Cir. 1994) 41 F.3d 527.) In any event, we are not persuaded that the same "logic" applies in these two very different contexts.

■ The wrongful death plaintiff is entitled to recover damages for his own pecuniary loss which may include loss of the decedent's financial support. (See generally, 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1423, pp. 903-904, § 1425, pp. 906-907.) The decedent's earning capacity is *not* the measure of damages for lost support. However, an acceptable way to show how much money would have been available for the support of a decedent's wife and children is to show what the decedent probably would have earned during the remainder of his life, and to deduct from that amount his personal maintenance expense and the amount he would have spent on other things. (Johns, Cal. Damages (5th ed. 1998) Wrongful Death and Survival Actions, § 524(b), pp. 5-36 to 5-38.) ■ By contrast, in a personal injury action where lost years damages are recoverable, the measure of damages is not lost support but rather lost earnings during the period the plaintiff would have lived if not for the injury. (*Fein, supra*, 38 Cal.3d at p. 153.) Speculating as to how the injured party may have spent those future earnings if not for defendant's tortuous conduct is a very different exercise than permitting a wrongful death plaintiff to prove damages for lost support by accounting for his or her supporter's other expenses.

In short, we conclude that Ingalls has failed to prove that it was entitled to cross-examine the Overlys' damages expert about Robert's prospective personal consumption during the period of his shortened life expectancy.

D. *The Allocation of Prior Settlements**

. . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 164.

## IV. DISPOSITION

The judgment is affirmed.

Kline, P. J., and Lambden, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 10, 1999.