Filed 9/24/18 (unmodified opn. attached)

<strong>CERTIFIED FOR PARTIAL PUBLICATION[1*]</strong>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GLENN WILLIAMS et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> THE PEP BOYS MANNY MOE & JACK OF CALIFORNIA, <br><br>     Defendant and Respondent. | A146060 <br><br> (City & County of San Francisco Super. Ct. No. CGC-11-275749) <br><br> ORDER MODIFYING OPINION AND CERTIFYING ADDITIONAL SECTION FOR PUBLICATION <br><br> (NO CHANGE IN JUDGMENT) |

THE COURT:

It is ordered that the opinion filed August 23, 2018, be modified as follows:

At the end of the introductory paragraph, appearing on pages 1–2, the following sentence shall be added:

> We hold further that a settlement offer under Code of Civil Procedure section 998 in a case in which plaintiffs assert both wrongful death and survival causes of action must be apportioned among such distinct claims.

The modification effects no change in the judgment.

In addition, part II.E. of the opinion in the above matter was not certified for publication in the Official Reports when filed on August 23, 2018. For good cause it now

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A., II.B., and II.D.

appears that part II.E. of the opinion, as modified herein, shall be included in the partial publication in the Official Reports and it is so ordered.


Dated:  09/21/2018                    _____

STREETER, ACTING P.J.

*Williams et al. v. The Pep Boys Manny Moe & Jack of California* (A146060)

| | |
|---|---|
| Trial Court: | City & County of San Francisco Superior Court |
| Trial Judge: | Hon. Teri Jackson and Hon. Charles F. Haines |
| Counsel for Appellants: | Farrise Law Firm, Simona A. Farrise and Alina Guzman; Arkin Law Firm, Sharon J. Arkin |
| Counsel for Respondents: | Dentons US LLP, Jules S. Zeman, Bradford J. DeJardin, Jennifer J. Lee |

Filed 8/23/18 (unmodified version)
**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GLENN WILLIAMS, et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>THE PEP BOYS MANNY MOE & JACK OF CALIFORNIA,<br><br>    Defendant and Respondent. | A146060<br><br>(San Francisco County<br>Super. Ct. No. CGC 11275749) |

Appellants are the seven adult children of decedent J.D. Williams (Decedent), who died in 2010 of mesothelioma allegedly caused by exposure to asbestos in brakes he purchased from defendant The Pep Boys Manny Moe & Jack of California (Pep Boys), an automotive parts retailer and service provider. In this lawsuit, filed in January 2011, they asserted claims for wrongful death, strict liability, and negligence. The trial court granted Pep Boys' motion for judgment under Code of Civil Procedure section 631.8 on appellants' wrongful death claims on the ground that they were barred by the statute of limitations, and also as to appellants' claim for punitive damages.[1] After a bench trial on the remaining claims, the trial court awarded appellants $213,052 as economic damages, but it found that amount was entirely offset by settlements appellants had entered into before trial with other parties. Appellants appeal from the resulting judgment, contending that the trial court erred in several respects. First, they contend that the trial court abused

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A., II.B., II.D., and II.E.

[1] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

1

its discretion in allowing Pep Boys to amend its answer to correct a previously-asserted statute of limitations defense.  Second, they contend that the trial court erred in granting Pep Boys' motion for judgment under section 631.8.  Third, appellants contend that the trial court erred in failing to award damages for the costs of providing home health services to their father and his wife, Betty Williams.  Fourth, they assert that the trial court erred in applying offsets to the award of economic damages based on prior settlements without allocating between the estate claims and the wrongful death claims.  Fifth, appellants contend the trial court erred in awarding expert fees to Pep Boys under section 998.  We will find merit in the third and fifth grounds, reverse the judgment in part, and remand to the trial court for further proceedings.  In the published portion of this opinion, we hold that damages recoverable in a survival action brought by a decedent's personal representative or successor in interest are limited to the loss or damage that the decedent sustained or incurred before death, and do not include " 'lost years' damages" that would have been incurred had the decedent survived.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.  Decedent's Exposure to Asbestos, Diagnosis, and Death

After trial, the trial court filed a statement of decision containing the following findings of fact, which are uncontested here:

"Decedent lived most of his adult life in a single family home in Los Angeles with his wife and children.  He was a do-it-yourselfer type of guy who rarely sent one of his automobiles into the shop for work.  This was especially true when it came to brake repair and replacement.  Decedent regularly inspected and when necessary did brake work on his cars by himself and with the help of his three boys."

"Decedent bought auto parts at four different shops in the area:  Pep Boys, Chief Auto Parts, Tracks and Crenshaw Auto Parts.  He mostly frequented Pep Boys and Chief Auto Parts but Pep Boys was his favorite.  Pep Boys sold asbestos-containing brakes during the 1960's through the mid-1980's.  From Pep Boys Decedent bought Bendix, EIS

---

[2] Additional facts pertinent to each of the issues are addressed in the discussion, *post*.

2

and Raybestos brand brakes during this period. Decedent also purchased and installed Wagner brakes. All four brands of brakes during this time period contained asbestos. Pep Boys did not sell Wagner brakes. Chief Auto did not sell EIS or Raybestos brakes but may have sold Bendix. The total number of brake jobs Decedent did himself was 28."

"During the mid-1960's through the early 1980's Decedent's male sons helped him install brakes. This involved helping their father remove old brake materials as well as refreshing brakes which didn't require replacement. All these activities involve brushing brake dust from auto wheel drums, grinding or sanding brake shoes, handling 'core' (old) brake parts and sweeping up brake dust. Any one of these activities alone and certainly all of them taken together resulted in Decedent experiencing multiple exposures to friable asbestos from auto brake parts. In the course of these activities Decedent inhaled asbestos fibers on many occasions."

"To summarize the evidence of Decedent's exposure to friable asbestos fibers is fairly simple. There was evidence that several sources of exposure to friable asbestos all constituted significant factors increasing his risk of contracting mesothelioma." The trial court specifically found that among those sources of exposure were Pep Boys' brake products, which contained asbestos that "exposed Decedent to friable asbestos fibers which he inhaled and which were a substantial factor which increased his risk of contracting mesothelioma."

In April 2010, Decedent was diagnosed with malignant mesothelioma. He died of mesothelioma on July 14, 2010 at the age of 75.

### B. The Pleadings

On January 7, 2011, appellants filed their initial complaint for wrongful death and survival (asbestos) against Does One through Seventy-Five. It sought to state causes of action for negligence (survival), strict liability (survival), wrongful death, misrepresentation and/or fraudulent concealment, premises liability, and loss of consortium for defendants' actions in, among other things, selling products containing asbestos, including products used for automotive purposes. The complaint was

3

accompanied by a declaration of Decedent's wife, Betty Williams, dated August 21, 2010, as Decedent's successor in interest and attaching his death certificate; the declaration was signed by Glenn Williams.[3]

On December 6, 2012, appellants filed a first amended complaint for wrongful death and survival (asbestos). Appellants named Pep Boys in the caption and causes of action, together with a number of other defendants. On December 27, Pep Boys filed an answer raising an affirmative defense that the first amended complaint was barred by applicable statutes of limitations, including section 340.2. On March 14, 2013, appellants filed a second amended complaint purporting to substitute Pep Boys as the Fifth Doe. On or about March 22, they filed a third amended complaint.

## C. Appellants' Discovery Responses

On May 31, 2011, appellants' then counsel John P. Mason of Clapper, Patti, Schweizer & Mason (the Clapper Patti firm), signed appellants' responses to defendants' first set of standard interrogatories. Those responses were verified by Glenn Williams on February 24, 2012, and were served on January 16, 2013. The record also contains a second, substantially similar verification by Glenn Williams dated February 8, 2014. In response to an interrogatory regarding Decedent's asbestos exposure outside of his work environment,[4] appellants provided the following detailed response: "Decedent performed brake jobs on personal vehicles he owned. Between approximately the early 1960s and 1980, Decedent performed approximately two to three brake jobs per year on his vehicles. Decedent installed EIS, Bendix, Raybestos, and Red Wing brand replacement brakes. Decedent replaced and installed both drum and disc brakes. Decedent used a

---

[3] Betty Williams died on April 14, 2014. Glenn Williams was named in the first amended complaint as Decedent's successor in interest.

[4] Interrogatory No. 32 reads: "Was the DECEDENT ever exposed to RAW ASBESTOS or ASBESTOS-CONTAINING MATERIAL(S) outside of the DECEDENT's work environment? If 'yes', please state for each such OCCASION: [¶] a. The circumstances surrounding the exposure; [¶] b. The date(s) and LOCATION; [¶] c. The duration and manner of the exposure; and [¶] d. DESCRIBE THE RAW ASBESTOS or ASBESTOS-CONTAINING MATERIAL(S)."

4

wire brush to scrape out the worn out brake shoe lining of drum brakes.  Decedent then used compressed air to clean out the brake assembly.  Decedent used sand paper on the new replacement brakes before installing them.  Decedent purchased replacement brake shoe linings at Pep Boys."

### D.  Pep Boys' Request for Hearing for Offer of Proof re Statute of Limitations

On January 12, 2015, Pep Boys filed a request for hearing for an offer of proof regarding the application of the statute of limitations to appellants' wrongful death claims.  In that pleading, Pep Boys asserted that when appellants filed their original complaint on January 7, 2011, appellants and their attorneys already had actual knowledge that (1) Decedent's illness and death were caused by exposure to asbestos; (2) automotive parts which they observed Decedent use contained asbestos; and (3) the automotive parts were purchased from Pep Boys.  Pep Boys took the position that the December 2012 first amended complaint did not relate back to the date of the original filing, and that appellants' wrongful death claims against Pep Boys were time-barred.  In the alternative, Pep Boys sought bifurcation of trial for application of its statute of limitations defense.  The request for hearing was based on, among other things, appellants' discovery responses, including the standard interrogatory responses and deposition testimony by several appellants, to the effect that before Decedent's death on July 14, 2010, Decedent's doctors told appellants the mesothelioma was caused by exposure to asbestos-containing products.  After Decedent's death, some of the appellants conducted research and learned that some of the products Decedent had used, including automotive parts he had purchased from Pep Boys, contained asbestos.  Appellants opposed the request.  Appellants asserted, among other things, that the request was procedurally improper and that Pep Boys had waived the statute of limitations defense.  Pep Boys later filed a trial brief addressing the waiver claim.

### E.  Pep Boys' Amended Answer and Appellants' Motion for Judgment on the Pleadings

In its answer, Pep Boys asserted a general statute of limitations defense that cited section 340.2, among other statutes.  The answer did not specifically cite subdivision (c)

5

of that statute, the subdivision of the statute that specifically pertains to wrongful death actions. In a hearing held on January 23, 2015, nominally the fourth day of trial,[5] Pep Boys orally sought leave to amend its answer to cure that technical defect. The trial court, finding that there was no prejudice to appellants, granted Pep Boys leave to amend its answer. Pep Boys filed that amendment on January 27.

Appellants thereafter moved for judgment on the pleadings as to the statute of limitations and other affirmative defenses asserted in Pep Boys' answer, asserting that the trial court should take judicial notice of Pep Boys' purported admission in discovery that it was not aware of facts to support that defense. Specifically, on June 5, 2014, in response to a form interrogatory asking it to set forth all facts upon which it denied various affirmative defenses, Pep Boys stated, "Plaintiffs generally allege they learned that Decedent's illness may have been asbestos-related as of a date certain and that he could not have learned of this at an earlier date. Plaintiffs' causes of actions may be barred by the stated statute of limitations based upon Decedent's alleged dates of employment and his Social Security records. Pep Boys is not presently aware of any information indicating that the claims are barred by the Statute of Limitations or Laches." Pep Boys opposed the motion on the grounds, *inter alia*, that a motion for judgment on the pleadings lies only for defects on the face of the pleadings. Because the motion was filed shortly before the commencement of trial, however, the trial court deferred any ruling on it pending the presentation of witness testimony.[6]

---

[5] It appears from the record that trial was originally set to commence on July 14, 2014, and was continued several times, ultimately to January 8, 2015. While the trial court held various pretrial proceedings during January, including finalizing settlements with named defendants, the trial against Pep Boys did not commence with the presentation of witness testimony until February 3, 2015.

[6] As discussed below, the trial court did not rule on the motion, which appellants withdrew during trial. (See note 9, *post*.)

6

**F. The Court Trial and Pep Boys' Motion for Judgment Under Section 631.8**

A bench trial was held from February 3 to February 23, 2015 before the Hon. Charles F. Haines. During the course of the trial, the court heard testimony (live or, in two cases, by deposition) by 16 witnesses, including all seven appellants, a corporate representative of Pep Boys, and several expert witnesses.

On February 23, 2015, at the close of appellants' case, Pep Boys moved for judgment under section 631.8. The motion sought judgment as to three issues: (1) that appellants' claims were time-barred under section 340.2; (2) that appellants had not offered evidence of fraud, malice, or oppression sufficient to support their punitive damages claim; and (3) that appellants had failed to show that Decedent's exposure to their asbestos-containing products was a substantial factor contributing to his risk of mesothelioma. Pep Boys' motion as to the first issue was based on appellants' trial testimony, which established that they had learned before their father's death that asbestos exposure causes mesothelioma and that some of the automotive parts with which he worked, including brake pads, contained asbestos. It was also based on appellants' signed interrogatory responses. Pep Boys argued that the statute of limitations on appellants' wrongful death claims ran on July 14, 2011, one year after Decedent's death. Because appellants first amended their complaint to name Pep Boys as a defendant on December 6, 2012, Pep Boys argued, their claims were time-barred. Pep Boys also relied on the purported knowledge of appellants' then counsel, the Clapper Patti firm. As to the punitive damages claim, Pep Boys asserted that appellants' evidence failed to show that Pep Boys had anything more than a general knowledge of the hazards of asbestos, and did not rebut testimony by Pep Boys' corporate witness that he first became aware in 1986 that asbestos caused disease in humans.

In their opposition to the motion, appellants asserted that Pep Boys had failed to show that they had knowledge of sufficient facts at the time of filing the original complaint to cause a reasonable person in their position to believe liability against Pep Boys was probable. They also asserted that Pep Boys could not properly assert that position while at the same time denying liability during and after trial. As to their

punitive damages claim, appellants asserted there was "overwhelming evidence" that Pep Boys knew it was selling asbestos-containing brake products for decades without warning its own employees or others, and without testing exposure levels. Appellants argued that Pep Boys' conduct in failing to institute safety measures and warnings, despite widespread knowledge of the health hazards posed by exposure to asbestos, constituted "conscious disregard" of those risks.

After a hearing, the trial court denied Pep Boys' motion for judgment as to causation, but granted the motion as to appellants' wrongful death and punitive damages claims. As to the wrongful death claims, the court observed that appellants' May 2011 interrogatory response, together with appellants' trial testimony, "overwhelmingly suggests that by May of 2011 [appellants] were aware that this decedent's disease was caused by an asbestos exposure and that Pep Boys was a probable -- and probable is the standard -- a probable person who is responsible." Because appellants did not name Pep Boys as a defendant until December 2012, the court found appellants' claims barred by the statute of limitations set out in section 340.1, subdivision (c)(1) and/or subdivision (c)(2), based on the following facts: "1) [Decedent] passed away on July 14, 2010; 2) Plaintiffs were aware that [Decedent's] disease was caused by an asbestos exposure and that Pep Boys was a probable person who could be responsible no later than May 2011; and 3) Plaintiffs failed to name Pep Boys as a defendant in this litigation until December 2012."

As to the punitive damage claim, the court found "no evidence that Pep Boys' conduct was malicious, oppressive or fraudulent as is required by [Civil Code section 3294, subdivision (a).]" The court indicated that it had considered all of the trial testimony, including testimony by expert witnesses and by Joseph Cirelli, Pep Boys' senior corporate spokesman, as well as Occupational Safety and Health Administration (OSHA) regulations issued at various times from 1971 through 1986. The court observed that although those regulations early on found a relationship between asbestos exposure and disease, they also stated that there were permissible levels at which employees could be exposed to asbestos for various activities including refacing brakes, and that a

8

reasonable retailer would view the regulations as being directed mostly at manufacturers rather than retailers of lawful products. The court observed that even if Pep Boys could be charged with negligence for failing to follow manufacturers' warnings, it could not find "even a scintilla of evidence of malice, oppression or fraud . . . ." It also found that appellants had not established such a basis for an award of punitive damages by the preponderance of the evidence, much less by the applicable clear and convincing evidence standard.

The trial court denied appellants' motions for reconsideration of its order, finding that appellants had not presented any new or different evidence. In particular, it found there was "no direct evidence at all that Defendant acted or failed to act with malice or fraud." Further, the court rejected as unreasonable appellants' contention that malice or fraud could be inferred from indirect evidence. Finally, it stated that it had considered and rejected evidence of Pep Boys' subsequent conduct after Decedent's exposure to asbestos.

### G. The Statement of Decision and Judgment

The trial court allowed counsel three court days to present closing arguments before taking the matter under submission. It then issued an order granting partial judgment in favor of Pep Boys, a tentative statement of decision and, after receiving and considering objections from both parties, a final statement of decision.

In its statement of decision, the trial court found Pep Boys liable on causes of action for strict liability for selling a defective product; for failure to warn consumers of the hazards of the defective product; and for general negligence. It awarded damages in the amount of $213,052, including the value of Decedent's employment and Social Security pensions from the date of his retirement through his natural lifespan. However, the court found that Pep Boys was entitled to offset against this recovery the value of good-faith settlements appellants had entered into prior to trial with other parties, which totaled $721,500. These settlements were apparently all lump-sum settlements, without any specific allocation between appellants' claims based on wrongful death as opposed to those based on the survivor's statute (§ 377.10 et seq.). The trial court rejected

9

appellants' position that because there was no allocation in the prior settlements, no offset would be appropriate. Rather, it found that "when a settlement itself contains no allocation between types of damages, the court applies the ratio of economic to non-economic damages in the jury verdict to the settlement offer offset as well." The court, having dismissed the wrongful death and punitive damages claims, had awarded only economic damages, and therefore found that 100% of the value of the settlement should be offset against the recovery. Finding that "the entirety of Plaintiffs' $213,052 award is wiped out by the $721,500 settlement offset," the court entered judgment that appellants shall take nothing from Pep Boys.

### H. Motion to Tax Costs

After the trial court entered partial judgment in its favor on appellants' wrongful death causes of action, Pep Boys filed a memorandum of costs in the amount of $32,542.51. In that memorandum, Pep Boys sought to recover, among other costs, $16,724.10 in expert witness fees it had paid to Michael Graham, M.D. Appellants filed a motion to tax costs, asserting those costs were not recoverable. In response, Pep Boys asserted that it was entitled to recover expert witness fees because before trial, it had served an offer to compromise pursuant to section 998 in the amount of $60,000, which appellants had not accepted. After holding a hearing and receiving further briefing, the trial court denied appellants' motion to strike or tax costs. The court found that a joint section 998 offer to all appellants was proper and did not preclude an award of expert witness fees to Pep Boys as the prevailing party.

This timely appeal followed.

## II. DISCUSSION

### A. The Trial Court Did Not Abuse Its Discretion in Granting Pep Boys Leave To Amend Its Answer.

Appellants first contend that the trial court erred in granting Pep Boys leave to amend its answer to correct its statute of limitations defense. We review that ruling for an abuse of discretion. (§ 473, subd. (a)(1) [court has discretion "upon any terms as may be just" to allow an amendment to any pleading]; *Record v. Reason* (1999) 73

10

Cal.App.4th 472, 486 [" '[T]he trial court has wide discretion in allowing the amendment of any pleading [citations], [and] as a matter of policy the ruling of the trial court in such matters will be upheld unless a manifest or gross abuse of discretion is shown.' ".)

As appellants acknowledge, "[i]t is well established that 'California courts "have a policy of great liberality in allowing amendments at any stage of the proceeding so as to dispose of cases upon their substantial merits where the authorization does not prejudice the substantial rights of others." [Citation.] Indeed, "it is a rare case in which 'a court will be justified in refusing a party leave to amend his [or her] pleading so that he [or she] may properly present his [or her] case.' " [Citation.]' [Citation.] Thus, absent a showing of prejudice to the adverse party, the rule of great liberality in allowing amendment of pleadings will prevail." (*Board of Trustees v. Superior Court* (2007) 149 Cal.App.4th 1154, 1163.) " 'In particular, liberality should be displayed in allowing amendments to answers, for a defendant denied leave to amend is permanently deprived of a defense.' " (*Royal Thrift and Loan Co. v. County Escrow, Inc.* (2004) 123 Cal.App.4th 24, 41.)

We find no abuse of discretion here. In its answer, Pep Boys pled a statute of limitations defense, citing section 340.2, the statute of limitations governing civil actions based upon exposure to asbestos. That defense was arguably defective, in that it did not specifically refer to any particular subdivision of section 340.2. (See § 458 [statute of limitations defense may be pled by stating the statute and subdivision relied upon].) [7] But

---

[7] We reject appellants' argument that Pep Boys waived the statute of limitations defense by failing to cite the statutory subdivision. That argument is based on early authority that strictly construed section 458. (*Davenport v. Stratton* (1944) 24 Cal.2d 232, 246–247 (*Davenport*).) More recent authority recognizes that where, as here, a defendant pleads a statutory limitations defense without specifying a subdivision, but there is only one subdivision " 'that could by any possibility be applicable' " to the case and the plaintiff does not interpose a demurrer to the answer, the defendant does not waive the statute of limitations as a defense. (*Hydro-Mill Co., Inc. v. Hayward, Tilton & Rolapp Ins. Associates, Inc.* (2004) 115 Cal.App.4th 1145, 1165 (*Hydro-Mill*).) As *Davenport* itself recognized, moreover, if a defendant fails properly to plead the statute of limitations, a trial court retains discretion to grant leave to amend an answer to avoid a waiver. (See *Davenport,* at pp. 252–253; *Hopkins v. Hopkins* (1953) 116 Cal.App.2d 174, 179–180 (*Hopkins*).)

11

appellants were not prejudiced in the slightest by that minor technical omission because there was no mistaking which subdivision Pep Boys was relying upon. Subdivision (c) of section 340.2 is the subdivision of that statute that applies to a civil action "for the wrongful death of any plaintiff's decedent, based upon exposure to asbestos," whereas subdivision (a) is the corresponding provision governing an action "for injury or illness based upon exposure to asbestos."[8] Obviously, in this wrongful death action, Pep Boys was relying upon subdivision (c), not subdivision (a).

Under the circumstances, appellants were not prejudiced by the trial court's decision to allow Pep Boys to amend its answer to add a specific reference to that subdivision, and the trial court did not abuse its discretion in so ruling. (See, e.g., *Hong Sang Market, Inc. v. Peng* (2018) 20 Cal.App.5th 474, 488 (*Hong Sang*) [trial court did not abuse discretion in allowing cross-defendant leave to amend her answer to assert res judicata defense]; *Sprague v. County of San Diego* (2003) 106 Cal.App.4th 119, 132 ["A trial court has discretion to permit the amendment of an answer to raise a statute of limitations defense in the furtherance of justice"].) Indeed, on these facts, it likely would have been an abuse of discretion, in our view, for the trial court to *deny* Pep Boys' request. (*Hopkins, supra*, 116 Cal.App.2d at pp. 179–180 [trial court abused its discretion in refusing defendant's request to permit a simple amendment to answer necessary to conform the pleading to the requirements of section 458 by inserting applicable subdivision of sections pleaded in original answer]; see *Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 545 ["where there is no prejudice to the adverse party, it may be an abuse of discretion to deny leave to amend"].)

Appellants' claims of prejudice are unpersuasive. First, appellants assert that had Pep Boys sought leave to amend its answer earlier, they could have amended their discovery responses or reconvened their own depositions to meet Pep Boys' limitations

---

[8] Subdivision (b) supplies the definition of "disability" as that term is used in subdivision (a).

12

defense. However, there was no need for them to do so, as all seven appellants testified at trial, and Pep Boys rested its motion for judgment under section 631.8 as to the statute of limitations defense on their trial testimony, not on their testimony in pretrial depositions.

Second, appellants assert that Pep Boys "disavowed" any limitations defense by stating in its interrogatory responses that it had no information to support the defense and then "springing this issue on plaintiffs after trial had already commenced." However, appellants do not explain how Pep Boys' failure to be more forthcoming in its written discovery responses could have justified the trial court in denying its motion for leave to amend its answer. In any event, appellants do not cite any record evidence to back up their unsupported assertion that Pep Boys' conduct adversely affected their trial preparation efforts or otherwise prejudiced them. If appellants truly needed additional time to prepare, they could have sought a continuance of the trial date. (Cf. *Gordon v. Superior Court* (1984) 161 Cal.App.3d 157, 168 [courts may treat discovery responses as binding where the failure to answer correctly in the first place prejudiced the other party and a continuance would not cure the prejudice].)

Finally, appellants claim that Pep Boys unreasonably delayed because Pep Boys did not seek leave to amend its answer until "the *sixth day of trial*" and the trial court did not grant its request until "the twelfth day of trial." However, appellants had been on notice since December 2012, when Pep Boys filed its answer, that Pep Boys was asserting a statute of limitations defense based on section 340.2. Appellants could have challenged the adequacy of that defense by filing a demurrer to the answer, but chose not to do so. (Cf. *Hydro-Mill, supra,* 115 Cal.App.4th at p. 1165 [where defendant did not interpose demurrer to answer which properly cited statutory limitations period but did not specify any subdivision, limitations defense was not waived].) Moreover, Pep Boys' assertion of that defense could not have come as a surprise to appellants, since, as appellants concede, other defendants in the same action had already raised the statute of limitations by way of both demurrer and summary judgment. Finally, Pep Boys filed its request for an offer of proof on January 12, 2015, which put appellants on further notice

13

that Pep Boys was relying on a limitations defense. While that nominally may have been the sixth day of trial, the trial itself did not actually commence until February 3, 2015, more than three weeks later. Any delay was not prejudicial. (See *Hong Sang*, *supra*, 20 Cal.App.5th at p. 488 [trial court did not abuse its discretion in granting leave to amend answer "on the eve of trial"].)[9]

## B. The Trial Court's Order Granting Pep Boys' Motion for Judgment Under Section 631.8 Must Be Affirmed.

Appellants contend that the trial court erred in granting Pep Boys' motion for judgment under section 631.8 as to its statute of limitations defense and their punitive damages claims. Section 631.8 allows a party in a bench trial to move for judgment after the other party has completed presenting his or her evidence. (§ 631.8, subd. (a); see *In re Javier G.* (2006) 137 Cal.App.4th 453, 458.) In considering such a motion, the court "shall weigh the evidence and may render a judgment in favor of the moving party . . . ." (§ 631.8, subd. (a).) "The purpose of . . . section 631.8 is to enable the court, when it finds at the completion of plaintiff's case that the evidence does not justify requiring the defense to produce evidence, to weigh evidence and make findings of fact." (*Pettus v. Cole* (1996) 49 Cal.App.4th 402, 424 (*Pettus*).) " ' "In weighing the evidence, the court may exercise the prerogatives of a fact trier *by refusing to believe witnesses and by drawing conclusions at odds with expert opinion . . . .*" ' " (*Eriksson v. Nunnink* (2015) 233 Cal.App.4th 708, 731 (*Eriksson*).)

"On appeal '[w]e resolve all evidentiary conflicts in favor of the prevailing parties, and indulge all reasonable inferences possible to uphold the trial court's findings.

---

[9] Appellants also contend that the trial court erred in denying their motion for judgment on the pleadings as to Pep Boys' statute of limitations defense. Both parties err, however, in asserting that the trial court denied that motion. The trial court did deny appellants' separate motion for judgment under section 631.8, filed on the first day of trial. However, it reserved ruling on appellants' motion for judgment on the pleadings. During trial, apparently recognizing that the trial court would address the same issues in ruling on Pep Boys' motion for judgment under section 631.8 based on the evidence presented at trial, appellants expressly withdrew their request that the trial court decide the motion for judgment on the pleadings "because we don't want to have any error in that regard."

[Citation.] . . . This court is without power to substitute its deductions for those of the trial court when the trial court could reasonably deduce two or more inferences from the facts.' " (*Eriksson, supra,* 233 Cal.App.4th at p. 731.) "The standard of review after a trial court issues judgment pursuant to . . . section 631.8 is the same as if the court had rendered judgment after a completed trial—that is, in reviewing the questions of fact decided by the trial court, the substantial evidence rule applies. An appellate court must view the evidence most favorably to the respondents and uphold the judgment if there is any substantial evidence to support it." (*Pettus*, *supra*, 49 Cal.App.4th at pp. 424–425.)

### 1. Statute of Limitations

Appellants' challenge to the trial court's ruling granting Pep Boys judgment under section 631.8 on their wrongful death claims requires us to decide the validity of appellants' use of the Doe defendant fictitious name procedure in relation to section 340.2, the statute of limitations governing actions for wrongful death arising from asbestos exposure. We conclude that the trial court did not err in finding that appellants' wrongful death claims are time-barred.

### a. The Fictitious Name Statute and the Statute of Limitations

Section 474 provides in pertinent part, "When the plaintiff is ignorant of the name of a defendant, he must state that fact in the complaint, . . . and such defendant may be designated in any pleading or proceeding by any name, and when his true name is discovered, the pleading or proceeding must be amended accordingly . . . ." "Section 474 allows a plaintiff who is ignorant of a defendant's identity to designate the defendant in a complaint by a fictitious name (typically, as a 'Doe'), and to amend the pleading to state the defendant's true name when the plaintiff subsequently discovers it. When a defendant is properly named under section 474, the amendment relates back to the filing date of the original complaint. [Citation.] Section 474 provides a method for adding defendants after the statute of limitations has expired, but this procedure is available only when the plaintiff is actually ignorant of the facts establishing a cause of action against the party to be substituted for a Doe defendant." (*McClatchy v. Coblentz, Patch, Duffy & Bass, LLP* (2016) 247 Cal.App.4th 368, 371–372, fn. omitted.) (*McClatchy*).) A trial court's finding

15

on this issue is reviewed for substantial evidence. (*Id.* at p. 373; accord *Wallis v. Southern Pac. Transportation Co.* (1976) 61 Cal.App.3d 782, 786 ["Appellate inquiry begins and ends with a determination of whether substantial evidence exists to warrant the trial court's finding"].)

Section 340.2, subdivision (c) provides, "In an action for the wrongful death of any plaintiff's decedent, based upon exposure to asbestos, the time for commencement of an action shall be the later of the following: [¶] (1) Within one year from the date of the death of the plaintiff's decedent. [¶] (2) Within one year from the date the plaintiff first knew, or through the exercise of reasonable diligence should have known, that the death was caused or contributed to by such exposure."

### b. The Trial Court Erred in Determining Appellants' Knowledge as Of "No Later Than May 2011," But Its Error Was Not Prejudicial

The trial court found appellants' claims barred by the one-year statute of limitations in section 340.1, subd. (c)(2) because "1) [Decedent] passed away on July 14, 2010; 2) Plaintiffs were aware that [Decedent's] disease was caused by an asbestos exposure and that Pep Boys was a probable person who could be responsible no later than May 2011; and 3) Plaintiffs failed to name Pep Boys as a defendant in this litigation until December 2012." Appellants contend that the trial court erred in determining their knowledge of the facts as of "no later than May 2011," when their counsel signed interrogatory responses on their behalf identifying Pep Boys as a source of Decedent's asbestos exposure, rather than as of January 2011, when appellants filed their original Doe complaint. While we agree this was error, we find it did not prejudice appellants because on the undisputed record before it, the trial court could not have reached any different conclusion.

As discussed above, section 474 allows a plaintiff to add a defendant after the statute of limitations has expired, if "the plaintiff is ignorant of the name of a defendant." (§ 474.) Although the statute speaks in terms of the plaintiff's ignorance of the

16

defendant's "identity," "the plaintiff is 'ignorant' within the meaning of the statute if he lacks knowledge of [the defendant's] connection with the case or with his injuries." (*General Motors Corp. v. Superior Court* (1996) 48 Cal.App.4th 580, 594 (*General Motors*).) Thus, "the relevant inquiry when the plaintiff seeks to substitute a real defendant for one sued fictitiously is what facts the plaintiff actually knew at the time the original complaint was filed." (*Id.* at p. 588, emphasis deleted.) "The plaintiff's knowledge is tested at the time suit is filed, and there is no requirement that the plaintiff exercise reasonable diligence to discover the identity of the defendant after filing the complaint." (*Sobeck & Associates v. B & R Investments No. 24* (1989) 215 Cal.App.3d 861, 867 (*Sobeck*).) Further, if the plaintiff was actually ignorant at the time of filing the original complaint of the facts establishing a cause of action against the defendant, it need not amend the complaint to substitute a fictitiously named defendant within the statutory limitations period following knowledge of such facts. (*Id.* at p. 870.) Rather, the amendment will relate back if made within three years of filing the original complaint, the deadline for serving a complaint under section 583.210, subd. (a). (*Sobeck,* at pp. 869–870; accord, *Winding Creek v. McGlashan* (1996) 44 Cal.App.4th 933, 940–942 [third amended complaint against attorneys related back to filing of original complaint, thus defeating the statute of limitations, despite plaintiffs' two-year delay between learning of the attorney defendants' alleged involvement and naming them as defendants]; *Munoz v. Purdy* (1979) 91 Cal.App.3d 942, 945–48; see also Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2019) ¶ 6:80.1 ["Because plaintiffs have up to 3 years in which to serve summons [citations], naming Doe defendants effectively enlarges the statute of limitations period as to unknown defendants for the 3-year period."].

Here, the trial court incorrectly suggested that section 474 merely "tolled" the statute of limitations until May 2011, when appellants' discovery responses established they had actual knowledge of the facts establishing a cause of action against Pep Boys.

Under the foregoing authority, if a plaintiff is actually ignorant of the facts when the complaint is filed, the statute of limitations is not tolled; rather, it does not begin to run. The trial court should have measured appellants' knowledge as of January 7, 2011, when they filed their original Doe complaint, not as of May 2011. However, " ' " ' "[a] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for the wrong reason." ' " ' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1271.) Moreover, "where, as here, we are called upon to review a conclusion of law based on undisputed facts, we are not bound by the trial court's decision and are free to draw our own conclusions of law." (*Pettus*, *supra*, 49 Cal.App.4th at p. 425.) Although the trial court applied the wrong legal standard in granting Pep Boys' motion for judgment, that error was not prejudicial on the undisputed record before the trial court, for the reasons we discuss below.

### c. Appellants' Knowledge When They Filed the Complaint

Appellants do not claim that they were ignorant of Pep Boys' identity as of January 7, 2011 when they filed their original Doe complaint in this action. To the contrary, they concede that they had actual knowledge at that time both of Pep Boys' identity and of many of the key facts establishing a cause of action against it, including that asbestos exposure had caused or contributed to their father's death, that brake products contained asbestos, and that he had purchased brake pads at Pep Boys. Thus, appellants do not dispute that they "had actual knowledge before they filed their complaint that: (1) Their father had mesothelioma; (2) Mesothelioma is caused by asbestos exposure; (3) Various automotive repair materials, including brake pads, during that era contained asbestos; and (4) Their father had purchased brake pads from Pep Boys and used those materials in his automotive repair work . . . ." Similarly, as appellants candidly acknowledge, "[t]here is even evidence that various siblings conducted research about the issues after their father died, that they learned that some brands of brake pads contained asbestos and that they shared that information with each other."

18

Those concessions find ample support in appellants' trial testimony. Thus, Carmen Williams testified that her father's oncologist advised her that her father had mesothelioma. After her father had gotten sick but before he passed away, she performed research and learned about the connection between mesothelioma and asbestos. From the research she did to determine what products her father had worked with that contained asbestos, she learned that some automotive parts contained asbestos. She and her sister Dierdre also did research to find legal counsel, and eventually retained the Clapper Patti firm to represent her family.

Glenn Williams similarly testified that through discussions with his father's doctors, he learned that his father's mesothelioma was caused by asbestos exposure. After he learned that, he and other family members did research to learn more about the subject, including what products his father may have worked with that could have caused him to be exposed. "We wanted to . . . read about it and find out what it was and everything we could about it." Through this research, they learned that some of the automotive parts his father worked with contained asbestos. They also learned that brake pads contained asbestos. Phyllis Williams, Dierdre Williams, and Jerome Williams all testified to similar effect. Further, Jerome Williams testified that after his father died, but before they contacted an attorney, he and his siblings had a meeting regarding the results of the research that they had performed.

Appellants also testified that they saw their father performing brake work on his cars, and that they recalled him purchasing automotive products, specifically brakes, from Pep Boys. Glenn Williams testified that he recalled his father performing brake work from approximately 1970 to 1983. He also accompanied his father to the Pep Boys store in Inglewood, California, where his father purchased brakes among other automotive parts. Christopher Williams testified that he recalled going with his father to a Pep Boys store to purchase brakes, from the 1960s to the early 1980s. Carmen Williams testified she recalled her father performing brake work from some time in the 1960s. She also recalled her father leaving to go purchase automotive parts and coming back with Pep Boys bags containing brakes and other automotive parts. Jerome Williams similarly

19

testified that he helped his father with brake jobs from about 1967 to 1977, and that he recalled his father frequently going to the Pep Boys store in Inglewood to purchase automotive parts.

Appellants' concessions were also supported by their discovery responses, where appellants asserted that Decedent was exposed to asbestos by installing brakes he purchased at Pep Boys.[10] Appellants claim that those responses "never identified Pep Boys as a source for those brake products and, most significantly, *never asserted that those brake products contained asbestos . . . .*" We disagree. The interrogatory in question asked appellants to state whether Decedent was exposed to asbestos-containing materials outside of his work environment. The responses answered that question in the affirmative, and then made clear that Decedent was exposed to asbestos by installing replacement brakes on his vehicles, some of which he purchased at Pep Boys: "Decedent performed brake jobs on personal vehicles he owned. Between approximately the early 1960s and 1980, Decedent performed approximately two to three brake jobs per year on his vehicles. Decedent installed EIS, Bendix, Raybestos, and Red Wing brand replacement brakes. Decedent replaced and installed both drum and disc brakes. Decedent used a wire brush to scrape out the worn out brake shoe lining of drum brakes. Decedent then used compressed air to clean out the brake assembly. Decedent used sand paper on the new replacement brakes before installing them. *Decedent purchased replacement brake shoe linings at Pep Boys.*"

_____

[10] Appellants assert cryptically that the date on which their prior counsel "purportedly" signed the interrogatory responses, May 30, 2011, was "likely a false artifact," but they point to no record evidence that the responses were not, in fact, signed on that date on their behalf. In fact, appellants' trial counsel explicitly acknowledged below that the interrogatory responses "were served on May 31st, 2011, or at least were prepared then and served later." (See *Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1088 (*Whitmire*) [rejecting plaintiff's attempt to contradict interrogatory responses where "a 'careful examination in light of the entire record' here yields no explanation for the discrepancy and no basis for concluding that the interrogatory responses were obviously mistaken"].)

20

While it is true that these discovery responses were prepared and signed by appellants' counsel in May 2011, four months after appellants filed their original Doe complaint, there is no reason on the undisputed record before us to conclude that they reflect anything more than appellants' knowledge as of the time they filed the original complaint. As appellants testified at trial, and concede here, they had actual knowledge when they filed their original complaint of Pep Boys' identity and of many of the facts establishing a cause of action against it. The interrogatory responses merely summarized the facts known to appellants when they filed suit. Under the circumstances, we cannot find that the trial court's incorrect focus on appellants' knowledge "no later than May 2011," while erroneous, prejudiced appellants. (See *McClatchy, supra*, 247 Cal.App.4th at pp. 373–374 [trial court did not err in determining that Doe amendment was untimely where new facts discovered by plaintiff after original petition was filed were "simply more of the same" and "did not add anything to the theory of liability apparent at the time of the original pleading"].)

### d. Analysis

Thus, as appellants candidly concede, before they filed their original complaint, appellants "knew most of the story." Appellants nevertheless contend that the knowledge they had at the time they filed their complaint was insufficient to establish that they knew or reasonably should have known they had a cause of action against Pep Boys. We conclude that the statute does not require the specific and detailed level of knowledge appellants demand. Even if it did, the undisputed record establishes that appellants had such knowledge when they filed their original complaint.

To reiterate, the Doe defendant procedure is "available only when the plaintiff is actually ignorant of the facts establishing a cause of action against the party to be substituted for a Doe defendant." (*McClatchy, supra,* 247 Cal.App.4th at p. 372.) " 'The question is whether [the plaintiff] knew or reasonably should have known that he had a cause of action against [the defendant].' " (*Ibid.*) " 'Ignorance of the *facts* giving rise to a cause of action is the "ignorance" required by section 474, and the pivotal question is, " 'did plaintiff know *facts*?' not 'did plaintiff know or believe that [he] had a cause of

21

action based on those facts?' " ' " (*Ibid.*) " 'Although it is true that a plaintiff's ignorance of the defendant's name must be genuine (in good faith) and not feigned [citations] and that a plaintiff need not be aware of each and every detail concerning a person's involvement before the plaintiff loses his ignorance [citations], it is equally true that the plaintiff does not relinquish [his] rights under section 474 simply because [he] has a suspicion of wrongdoing arising from one or more facts [he] does know.' " (*Ibid.*) The question here, therefore, is whether appellants had sufficient knowledge, at the time they filed their complaint, of the facts establishing a cause of action against Pep Boys such that they should have named Pep Boys in the original complaint.

Appellants contend that Pep Boys failed to show that "plaintiffs had *actual knowledge* before filing their complaint that *the specific automotive repair products* that their father purchased from Pep Boys *actually contained asbestos* and that his use of those products caused him asbestos exposure *sufficient* to increase his risk of disease." The first part of that contention, as we have shown, is incorrect: as they expressly admitted in their trial testimony and interrogatory responses, appellants knew that Decedent was likely exposed to asbestos by using brake products he purchased from Pep Boys. The second part—that appellants did not know that Decedent's level of exposure was sufficient to cause disease—appears to be based on appellants' contention that Pep Boys was required to show not only that they had actual knowledge of the facts, but also that they believed that there was "a reasonable *probability* of success." But that would impose too high a burden.

Appellants rely upon case authority stating that "Section 474 allows a plaintiff in good faith to delay suing particular persons as named defendants *until he has knowledge of sufficient facts to cause a reasonable person to believe liability is probable*." (*Dieckmann v. Superior Court* (1985) 175 Cal.App.3d 345, 363, italics added.) As the presiding justice of Division Five of this court has observed, however, the italicized phrase, which has been repeated by other courts, is "an isolated and unfortunate misstatement of the standard." (*McClatchy, supra,* 247 Cal.App.4th at p. 378 (conc. opn. of Jones, P.J.).) Rather, "cases have consistently construed the statute as permitting a

22

plaintiff to delay suing persons or entities whose identity is known so long as the plaintiff remains 'ignorant of the facts giving him a cause of action against [the defendant].' " (*Ibid.*, fn. omitted.) "Under this standard, '[t]he pivotal question in this regard is "did plaintiff know *facts*?" not "did plaintiff know or believe that she had a cause of action based on those facts?" ' " (*Ibid.*) We agree that the italicized phrase from *Dieckmann* "is unsupported by any statutory or case authority," and, if applied literally, "would authorize delay in seeking amendment under section 474 until well after a plaintiff became aware of facts indicating the existence of a potential cause of action against the Doe defendant." (*Id.* at p. 379.) "Whether appellant knew or subjectively believed he had a cause of action against the [defendant] based on those facts is not the test." (*Ibid.*)[11]

In any event, even if *Dieckmann*'s "probable liability" approach was the correct standard, the trial court's finding that standard was met is supported by substantial evidence. As discussed above, it is undisputed that appellants and their attorneys knew, before they filed their original complaint, that Decedent's illness and death were caused by asbestos exposure; that brake products contained asbestos; and that Decedent purchased and used brake products from Pep Boys. Thus, the undisputed record establishes that when appellants filed the original complaint, they were not ignorant of the facts on which their claims against Pep Boys are based. (*McClatchy, supra*, 247 Cal.App.4th at p. 373.) Appellants' purported uncertainty about whether those facts

---

[11] For that reason, appellants' heavy reliance in their reply brief on *General Motors*, *supra*, 48 Cal.App.4th 580 is misplaced. *General Motors* applied *Dieckmann*'s mistaken "probable liability" standard. (*General Motors,* at p. 595.) In any event, the court there held only that "a driver who is injured in an automobile accident when she is wearing a seat belt which appears to the naked eye to have operated in its intended fashion does not know the basic facts she needs to plead a products liability claim against the manufacturer of the seat belt." (*Id.* at p. 598.) Here, in contrast, appellants *did* have such "basic facts," including the facts that their father's disease was caused by asbestos exposure and that he had purchased and used asbestos-containing brakes from Pep Boys. Neither *General Motors* nor any other case supports appellants' extreme position that to have actual knowledge of the facts, a plaintiff must "understand the applicable principles of causation" that will be the subject of expert testimony.

would be sufficient to prove causation at trial does not alter the fact that appellants "knew everything [they] needed to know" about Pep Boys when they filed their original complaint. (*Optical Surplus, Inc. v. Superior Court* (1991) 228 Cal.App.3d 776, 784 (*Optical Surplus*).) Appellants "failed to demonstrate that at the time the complaint was filed [they were] ignorant of facts having a bearing upon the liability of [Pep Boys]." (*Snoke v. Bolen* (1991) 235 Cal.App.3d 1427, 1432.)

Appellants contend that the knowledge of their attorneys cannot be imputed to them for purposes of the statute of limitations, asserting that "constructive or imputed knowledge is not sufficient." However, none of the cases which appellants cite for that proposition supports their position,[12] which is contrary to long-standing authority. In *Miller v. Thomas* (1981) 121 Cal.App.3d 440, for example, plaintiff was involved in an automobile accident with an undercover police officer, who identified himself to plaintiff at the scene. (*Id.* at p. 442.) Shortly thereafter, plaintiff retained an attorney to represent her with respect to the collision, and informed him that Thomas was the driver of the other vehicle and was an undercover officer for the City of Los Angeles. (*Ibid.*) Plaintiff's attorney subsequently filed a complaint naming as defendants the City of Los Angeles and several Doe defendants. (*Ibid.*) More than two years later, plaintiff's successor attorney amended the complaint to name Thomas as Doe 1. (*Id.* at p. 443.) Defendant moved for summary judgment on statute of limitations grounds. (*Ibid.*) In opposition to the motion, plaintiff and her three attorneys filed declarations to explain the delay. (*Ibid.*) Plaintiff's declaration stated that although her first two attorneys had informed her that the City of Los Angeles, as Thomas' employer, was liable for her

---

[12] None of appellants' cases involved any question of whether actual knowledge of a defendant's identity, or of the facts, could be imputed from one party to another, or from a party's attorney to the party. Those cases stand only for the proposition that a plaintiff may use section 474 "whenever he has no actual knowledge of the defendant; constructive or legal knowledge will not deprive the plaintiff of the remedy." (*Sobeck*, *supra*, 215 Cal.App.3d at p. 867; see also *Balon v. Drost* (1993) 20 Cal.App.4th 483, 488–489 [same].) Here, both appellants and their former trial attorney had actual knowledge of Pep Boys' identity and of the facts giving rise to a cause of action against it.

injuries and damages, neither of them told her that she had a cause of action against Thomas. (*Id.* at p. 444.) The court affirmed summary judgment for Thomas, holding that the complaint was time-barred because plaintiff conceded that within minutes after the accident, she knew that Thomas was the operator of the vehicle which had collided with hers, and that she so informed the attorney whom she first employed. (*Id.* at p. 445.) The court specifically rejected plaintiff's attempt to disclaim knowledge that she had a claim against Thomas: "Plaintiff's declaration that 'I did not know [Thomas] could be liable for my injuries . . .' is of no consequence because her attorney, who prepared and signed the complaint, was fully informed." (*Ibid.*; see also *id.* at p. 446 ["Thomas could not have been a person whose identity or legal responsibility or connection with the accident was unknown to the attorney who drafted the complaint. A fortiori Thomas could not have been one of the persons who had been named in the complaint as 'Doe' by reason of the plaintiff's lack of knowledge concerning him."].)[13] Thus, *Miller* squarely held that the knowledge requirement of section 474 includes facts known by a plaintiff's attorneys.

Appellants also argue that the fact that Pep Boys presented expert testimony at trial denying that Decedent's exposure to asbestos from its brake products caused his cancer is "compelling proof that plaintiffs could not have had actual knowledge that [Decedent's] exposure to asbestos from brake products purchased from Pep Boys was sufficient to cause his disease or that they should have had a reasonable belief in the probability of success of their claims against Pep Boys." That contention is wholly unconvincing. To state the obvious, a plaintiff need not be a scientist or a physician in order to have sufficient knowledge of facts establishing a cause of action against a party. Further, a party's denial of liability does not relieve a plaintiff of the obligation timely to

---

[13] Accord, *Stephens v. Berry* (1967) 249 Cal.App.2d 474, 477 [Complaint naming driver as Doe defendant was time-barred where the evidence made it "perfectly plain that, almost from the very moment of the accident, appellants were aware of the identity of Berry and of the fact that he was the driver of the Ford Falcon that had struck their station wagon from behind. Appellants' attorney had the same information long before suit was filed. Thus appellants could not sue Berry by a fictitious name because they knew his real name."].

25

name the party as a defendant once he or she has such knowledge. (See *Optical Surplus, supra,* 228 Cal.App.3d at p. 784 [plaintiff could not justify his untimely amendment of complaint to substitute defendant for Doe 1 by relying upon defendant's denial of liability in response to demand letter; "Optical's reply to the demand letter was irrelevant, and [plaintiff's] self-serving suggestion that he believed the reply letter cannot change the fact that [plaintiff] knew everything he needed to know about Optical when he filed his original complaint"].)

Finally, appellants argue that Betty Williams could not have had actual knowledge of any facts because she had Alzheimer's disease and "did not even understand that her husband was dead, let alone what had caused his death or who was responsible for it."[14] In denying appellants' motion for reconsideration on this ground, the trial court found as follows: "Decedent's wife, Betty Williams, executed a valid power of attorney in favor of her son, Glenn, in 2003. This document was admitted into evidence during the trial. There was substantial evidence adduced at trial that at the time her husband died in 2010 she was incompetent. However, there is no substantial evidence that at the time she executed the power of attorney she was incompetent . . . . Therefore, when the son, Glenn, was found to have had actual knowledge of his own claims against Pep Boys so did his mother by virtue of the authority stated in the power of attorney." Further, apparently acting under that authority, Glenn Williams signed a declaration on her behalf attached to appellants' original complaint asserting that she was Decedent's successor in interest. He also verified appellants' interrogatory responses on behalf of all appellants.

Appellants' sole response to this evidence is to repeat its assertion that constructive knowledge is not sufficient. However, appellants' discovery responses constituted an admission of actual knowledge on behalf of all appellants, who joined in a single cause of action for wrongful death. (§ 377.60; see *Adams v. Superior Court* (2011) 196 Cal.App.4th 71, 75 ["California courts interpret the wrongful death statutes to

_____

[14] Although Betty Williams died in 2014, a claimant's wrongful death cause of action survives the claimant's subsequent death. (§ 377.20, subd. (a); see *Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1443–1444.)

26

'authorize only a single action, in which all the decedent's heirs must join.' ").
Appellants did not object below to the admission of those discovery responses, or claim
that they were not binding on Betty Williams because she was incompetent. (See
*Whitmire, supra,* 184 Cal.App.4th at p. 1087 [affirming summary judgment for
defendants in action for negligence and strict liability related to plaintiff's exposure to
asbestos based in part on plaintiff's admissions in discovery responses, which were
entitled to "great weight"]).

### 2. Appellants Have Waived Their Challenge to the Trial Court's Order as to Punitive Damages.

Appellants also contend that the trial court erred in granting Pep Boys' motion for
judgment under section 631.8 on their punitive damages claim. However, it is a
fundamental requirement of appellate procedure that an appellant who challenges the
sufficiency of the evidence must set forth all of the evidence on the point, not just the
evidence favoring its position. "When appellants challenge the sufficiency of the
evidence, all material evidence on the point must be set forth and not merely their own
evidence. [Citation.] Failure to do so amounts to waiver of the alleged error and we may
presume that the record contains evidence to sustain every finding of fact." (*Jordan v.
City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1255; see also *Rodriguez v. North
American Rockwell Corp.* (1972) 28 Cal.App.3d 441, 448 [appellant's "selective
statement of the evidence" waived claim that judgment of nonsuit was not supported by
substantial evidence]; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)
Because appellants have not complied with that rule, they have waived their challenge to
the trial court's ruling.

Here, appellants contend that the trial court's findings establish that it erred in
granting Pep Boys judgment on their claim for punitive damages. They summarize
evidence in the record that they contend establishes that Pep Boys had knowledge of the
hazards associated with asbestos exposure, and continued to sell asbestos-containing
brake parts to customers, including Decedent, without providing any separate warnings.
Nowhere, however, do appellants squarely address the evidence that Pep Boys adduced

and upon which the trial court relied in its ruling. For example, the trial court highlighted in some detail the various regulations issued by OSHA that established permissible levels of exposure to asbestos for manufacturers and commercial brake resurfacers, yet appellants refer to those regulations only in passing. Even more significantly, appellants ignore testimony adduced by Pep Boys (discussed below) that it first became aware of the health hazards of exposure to asbestos in 1986, long after Decedent's exposure; and they overlook the key distinction between permissible levels of exposure for manufacturers and commercial mechanics, on the one hand, and retail customers, on the other. Because those omissions violate the rule summarized above, appellants have waived any challenge to the trial court's ruling on punitive damages.

### 3. Appellants Have Not Shown That the Evidence Compelled An Award of Punitive Damages As A Matter Of Law.

Even if appellants had not waived their challenge to the trial court's punitive damages ruling, they have not shown that the evidence compelled an award of punitive damages as a matter of law. It was appellants' burden to prove entitlement to punitive damages by clear and convincing evidence. Civil Code section 3294 authorizes an award of punitive damages if a plaintiff proves by clear and convincing evidence that defendant is guilty of oppression, fraud, or malice. (Civ. Code, § 3294, subd. (a).) "The clear and convincing standard ' "requires a finding of high probability . . . ' "so clear as to leave no substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind." ' " ' " (*Scott v. Phoenix Schools, Inc.* (2009) 175 Cal.App.4th 702, 715.) The trial court found appellants failed to carry that burden.

"When . . . the plaintiff has the burden of proving the elements of his claim and the court finds he has failed to satisfy that burden, judgment will be for the defendant—even if there is no evidence supporting the defense." (*Eriksson, supra*, 233 Cal.App.4th at p. 732.) "Thus, '[w]hen the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals . . . the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes

28

whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Id.* at p. 733.) Accordingly, "we review the record to determine whether the evidence establishes, as a matter of law," that Pep Boys acted with malice, fraud, or oppression under that standard. (*Id.* at p. 734.)

Appellants argue that they presented evidence constituting a "classic" case for punitive damages on the basis of malice. They rely heavily on *Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270 (*Pfeifer*), which affirmed a judgment for negligence and strict liability in favor of a boiler technician against a manufacturer of asbestos-containing gaskets and packing (JCI). Plaintiff had worked as a boiler tender in the Navy, and from 1971 to 1982 as a boiler technician, and had removed and replaced JCI's products. After a bifurcated jury trial, the jury returned special verdicts in plaintiffs' favor and awarded plaintiffs punitive damages, finding that JCI had acted with malice, fraud, or oppression. (*Id.* at p. 1284.) The court, viewing the evidence in the light most favorable to plaintiffs, held there was substantial evidence to support that finding. (*Id.* at p. 1299.) It concluded that the evidence was sufficient to show malice, "that is, despicable conduct coupled with a conscious disregard for the safety of others. In view of JCI's compliance with the OSHA regulations regarding its own workplace, JCI fully understood that asbestos dust endangered workers, but it did not issue warnings to customers until 1983, notwithstanding its awareness that they used the products in ways that generated considerable asbestos dust. Indeed, although JCI informed its employees that the asbestos used in making 2150 sheet gaskets caused cancer, JCI provided that information to customers only when they asked for the safety data sheet. The evidence thus established that JCI carried on despicable conduct with an awareness of the 'probable dangerous consequences,' and 'willfully fail[ed] to avoid such consequences.' " (*Id.* at pp. 1300–1301; see also *Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 34–35.)

Although appellants undoubtedly are correct that the evidence presented here bears a number of similarities to that in *Pfeifer*, we cannot find that the trial court erred in

finding that they failed to establish entitlement to punitive damages by clear and convincing evidence as a matter of law. That is so for at least two key reasons.

First, in contrast to JCI, which first became aware of the health risks of exposure to asbestos in 1970 and began monitoring the concentrations of asbestos fibers in the air in its factories in 1972 (*Pfeifer*, supra, 220 Cal.App.4th at p. 1300), Cirelli, a Pep Boys senior executive whom appellants called as an adverse witness in their case-in-chief, testified that until 1986, Pep Boys was unaware that asbestos posed a hazard. In 1986, it received a Federal Register notice indicating that inhalation of asbestos fibers posed health risks including respiratory disease, cancer, and mesothelioma. That was the first time Cirelli became aware of those risks.[15] After Pep Boys learned of the hazards of asbestos, it conducted testing in its service shops, and the results "always came back below required levels and said no further action required."[16] Appellants did not present any contrary evidence. Appellants' expert, Dr. James Castleman, admitted that he had no information as to when Pep Boys learned that brake pads or brakes themselves contained asbestos. Thus, the trial court reasonably could have concluded that the evidence presented at trial did not establish malice as a matter of law because Decedent's exposure, which ended by the mid-1980's, predated Pep Boys' knowledge of the dangers posed by its products. (Cf. *Pfeifer*, at pp. 1300–1301.)

Second, the trial court reasonably could have found that plaintiffs did not prove malice as a matter of law because of how the state of scientific knowledge regarding the

---

[15] Appellants' trial counsel asserted that because Cirelli was first employed by Pep Boys in 1977, he "could offer no personal knowledge because he was ten years old when the OSHA regulations came out," and that he "never even talked to [other Pep Boys employees]" to find out what was done." But it was *appellants'* burden to prove entitlement to punitive damages by clear and convincing evidence, not Pep Boys' burden to rebut that claim.

[16] Appellants introduced evidence at trial that Pep Boys was cited for certain asbestos-related violations by the U.S. Department of Labor. However, those citations occurred in 1991, long after Decedent's exposure to asbestos from brakes he purchased from Pep Boys, which occurred "during the 1960's through the mid-1980's."

risks of asbestos exposure evolved over time.  Contrary to the later scientific understanding that there is no "safe" level of exposure to asbestos dust, the OSHA regulations that issued over the period 1971 through 1986 specified permissible levels of asbestos particles.  Again, Cirelli's testimony was that Pep Boys met those required levels in the years following Decedent's exposure when it was required to test the air in its auto service shops.  Moreover, the regulatory focus initially was on automotive service shops, where professional mechanics who worked on multiple vehicles every day were exposed to far greater volumes of asbestos dust than retail customers like Decedent.  Dr. Castleman testified that the first directive from a government agency that addressed safety practices on the part of so-called "shade tree mechanics,"[17] rather than professional mechanics, was the Gold Book published in 1986 by the EPA.

Appellants fault the trial court for erroneously concluding it "could not consider" unspecified indirect evidence in assessing malice, but that misstates what the trial court actually found.  Rather, it rejected as unreasonable appellants' arguments that it should infer malice or fraud from the indirect evidence; as it explained, "As part and parcel of their closing argument Plaintiffs advanced numerous conclusions which might be drawn from the indirect evidence that there was malice and fraud on the part of [Pep Boys].  However, the Court was aware of those possible conclusions based upon circumstantial evidence when it granted the . . . motion under [section] 631.8 and rejected them as unreasonable."  Appellants' apparent contention that the trial court was required to draw those inferences is inconsistent with the controlling substantial evidence standard, which provides that "when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874.)

Appellants also assert the trial court erred in assessing malice from the perspective of what a "layperson" at the time would have known.  That contention misstates the trial

---

[17] "A 'shade tree mechanic' is someone who maintains and repairs his vehicles himself." (*Adams v. Ford Motor Co.* (2011) 199 Cal.App.4th 1475, 1478, fn. 2.)

31

court's observations. In context, the trial court merely remarked that Cirelli, as a business executive rather than "a scientist with a medical or scientific background," reasonably would have consulted the OSHA regulations, and would have learned from them that "there's some controversy about what are the safe levels of asbestos. . . . [¶] . . . [¶] . . . . And these are workers by the way, not, as been called in this case, shade-tree mechanics." As the trial court observed, from the standpoint of a retailer, such a review of the regulations would have concluded that "OSHA's telling them that there is a permissible level [of asbestos to which] workers can be exposed." Thus, the trial court concluded, "I think a reasonable retailer would view these as being directed mostly at manufacturers, but also, even if you were talking about brake resurfacers in the commercial setting, and they're clearly stating that there's a permissible level."

For these reasons, we reject appellants' claim that the trial court was compelled to find they were entitled to punitive damages as a matter of law. (See, e.g., *Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 58–62 (*Hoch*) [affirming nonsuit on issue of punitive damages, finding insufficient evidence defendant had consciously disregarded decedent's rights]; see also *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 890–893 [reversing awards of punitive damages not supported by clear and convincing evidence of despicable conduct]; *Barry v. Raskov* (1991) 232 Cal.App.3d 447, 457–458 [affirming grant of nonsuit on claim for punitive damages due to absence of clear and convincing evidence of fraud].)

## C. The Trial Court Erred in Its Damages Award.

Appellants contend that the trial court erred in limiting its award of damages to Decedent's lost Social Security and pension benefits, arguing that the trial court also should have awarded damages for the cost of Decedent's home health care and the home health care damages incurred by his estate in caring for his wife. In response, Pep Boys contends that plaintiffs were not entitled to recover damages for any of those items. Whether a plaintiff is entitled to a particular measure of damages is a question of law subject to de novo review. (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1324 (*Bermudez*).)

A "survival" action may be prosecuted by the estate's executor or administrator or by the victim's successor in interest. (§§ 377.11, 377.20, 377.30.) The measure of damages recoverable in such an action is supplied by section 377.34, which states, "In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement." Thus, "under California's survival law, an estate can recover . . . the deceased plaintiff's lost wages, medical expenses, and any other pecuniary losses incurred before death . . . ." (*County of Los Angeles v. Superior Court* (1999) 21 Cal.4th 292, 304.)

### 1. Appellants Were Entitled to Recover the Reasonable Value of Home Health Care Services They Provided to Decedent Prior to His Death.

We start by addressing the recoverability of home health care and other costs, the principal issue raised by appellants. Appellants sought damages for the value of home health care and other household services provided to Decedent before his death by several of his children, of which substantial evidence was presented at trial. The trial court, without explanation,[18] did not award any damages for the value of those services. As Pep Boys effectively concedes,[19] the trial court erred in that regard.

"In tort actions, medical expenses fall generally into the category of economic damages, representing actual pecuniary loss caused by the defendant's wrong." (*Hanif v.*

---

[18] From what we can determine, the trial court appeared to accept Pep Boys' incorrect assertion that such damages are recoverable only in a wrongful death action. That assertion was at odds with Pep Boys' express concession below that in a survival action, "Plaintiffs may be awarded loss of household services for the time period of [Decedent's] illness, up until his death."

[19] Pep Boys has not responded to appellants' showing that they were entitled to damages for the reasonable value of such services rendered prior to Decedent's death. Instead, it asserts only that "[t]he trial court's denial of household services *subsequent to Mr. Williams' death* was correct." (Italics added.)

*Housing Authority* (1988) 200 Cal.App.3d 635, 641 (*Hanif*).) "A person who undergoes necessary medical treatment for tortiously caused injuries suffers an economic loss by taking on liability for the costs of treatment. Hence, any reasonable charges for treatment the injured person has paid or, having incurred, still owes the medical provider are recoverable as economic damages." (*Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541, 551.)

California law supplies a special rule where such medical services are gratuitously provided by family members. "It is established that 'The reasonable value of nursing services required by the defendant's tortious conduct may be recovered from the defendant even though the services were rendered by members of the injured person's family and without an agreement or expectation of payment. Where services in the way of attendance and nursing are rendered by a member of the plaintiff's family, the amount for which the defendant is liable is the amount for which reasonably competent nursing and attendance by others could have been obtained. The fact that the injured party had a legal right to the nursing services (as in the case of a spouse) does not, as a general rule, prevent recovery of their value, . . .' " (*Hanif, supra,* 200 Cal.App.3d at pp. 644–645 [holding that trial court properly awarded reasonable value of 24-hour home attendant care provided by plaintiff's parents]; accord, *Rodriguez v. McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 661–662, disapproved on other grounds, *Coito v. Superior Court* (2012) 54 Cal.4th 480, 499 [reasonable value of 24-hour home attendant care provided by plaintiff's spouse].)

This rule applies squarely here. Thus, the trial court erred in failing to award damages for the reasonable value of the medical and other services appellants provided to Decedent before his death.

### 2. Appellants Were Entitled to Recover Household Services Damages for Care Decedent Would Have Provided to His Wife Prior to His Death, But Not Thereafter.

Appellants also sought damages for the value of home health care damages incurred by Decedent's estate in caring for Decedent's wife, Betty Williams, before she

passed away in April 2014. Those claims fell into two periods, before and after Decedent's death, that warrant separate discussion.

The first category consists of the reasonable value of nursing and other services that Decedent would have provided to his wife prior to his death, but was unable to provide due to his illness ("replacement care"). Again, Pep Boys does not contest the recoverability of such damages here. Nor did it below. Such damages are recoverable. (See Civ. Code, § 1431.2, subd. (b)(1) [defining "economic damages" to include "costs of obtaining substitute domestic services"]; CACI No. 3903E ["Loss of Ability to Provide Household Services (Economic Damage)"].) "Generally, household services damages represent the detriment suffered when injury prevents a person from contributing some or all of his or her customary services to the family unit." (*Overly v. Ingalls Shipbuilding, Inc.* (1999) 74 Cal.App.4th 164, 171, fn. 5 (*Overly*).) Substantial evidence having been presented below that the estate incurred such damages, the trial court shall determine a reasonable amount on remand.

The second category requires more discussion. That consists of the reasonable value of 24-hour nursing care that Decedent *would have provided* to his wife *after* his death and before she passed away in 2014, nearly four years later. As appellants explain this claim, "to the extent his children were forced to provide gratuitous home health care and other household services to Betty up to the time of her death, [Decedent's] estate is also entitled to recover those costs as damages since he had been providing those services for his wife before he died." Appellants claim that the reasonable value of such services was over $700,000. The parties disagree as to whether such damages are recoverable. Appellants contend that they are properly recovered as " 'lost years' damages," representing economic losses the decedent incurred during the period by which his life expectancy was shortened; Pep Boys, in contrast, contends that they are not recoverable because they were not "sustained or incurred before death," as required by section 377.34. We conclude that Pep Boys has the better argument.

We start, as we must, with the plain language of section 377.34. " ' "We begin by examining the statutory language because it generally is the most reliable indicator of

35

legislative intent. [Citation.] We give the language its usual and ordinary meaning, and '[i]f there is no ambiguity, then we presume the lawmakers meant what they said, and the meaning of the language governs.' " ' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1369.) Section 377.34, as noted, provides in pertinent part that "the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived . . . ." As one court has observed, Pep Boys' position that damages for lost pension benefits or other losses that occur following a decedent's death are not recoverable appears "consistent with the plain language of section 377.34," since by definition such damages are not " 'loss or damage that the decedent sustained or incurred before death.' " (*Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1652, 1654 (*Stevens*).) [20]

The same conclusion follows from established canons of statutory construction. The only damages specified by section 377.34 "that the decedent would have been entitled to recover had the decedent lived" are "penalties or punitive or exemplary damages." Under the principle *expressio unius est exclusio alterius*, " 'the enumeration of things to which a statute applies is presumed to exclude things not mentioned.' " (*People v. Salas* (2017) 9 Cal.App.5th 736, 742.) By expressly authorizing recovery of only penalties or punitive damages that the decedent would have been entitled to recover had the decedent lived, the Legislature necessarily implied that *other* categories of damages that the decedent would have been entitled to recover had the decedent lived would *not* be recoverable in a survival action. (See *id.* at pp. 742–743 [by expressly

---

[20] *Stevens* declined to decide whether section 377.34 prohibits recovery of lost pension benefits, because the defendant manufacturer had stipulated to an instruction requiring the jury to assess damages for lost pension benefits if it found the manufacturer liable for causing plaintiff's lung cancer and therefore invited any error. (*Stevens, supra,* 49 Cal.App.4th at pp. 1653–1655; see also *Williamson v. Plant Insulation Co.* (1994) 23 Cal.App.4th 1406, 1418, fn. 5 (*Williamson*) ["We express no opinion as to the proper measure of economic damages incurred during [plaintiff's] lifetime, including the question whether loss of future earning capacity is an element of such damages."].)

permitting recovery for expenses incurred to install or increase residential security related to a violent felony, the Legislature by implication did not permit recovery of such expenses incurred related to an offense that is not a violent felony].)

Appellants rely upon *Overly, supra,* 74 Cal.App.4th 164, but it supports Pep Boys' position, not appellants'. *Overly* was an action for personal injury and loss of consortium resulting from asbestos exposure. The trial court permitted plaintiffs to introduce evidence and seek recovery for "loss of future economic benefits that [Overly] would have earned during the period by which his life expectancy was shortened, i.e., 'lost years' damages, in the form of pension, Social Security and 'household services' benefits." (*Id.* at p. 171.) The court rejected appellant's argument that plaintiffs were not entitled to recover damages for Overly's prospective earnings during the lost years, holding that such an award is "consistent with relevant authority." (*Id.* at p. 172.) Neither of the cases it cited, however, was a survival action by an estate or other personal representative. (*Fein v. Permanente Group* (1985) 38 Cal.3d 137, 153 [medical malpractice]; *Hurlbut v. Sonora Community Hospital* (1989) 207 Cal.App.3d 388, 405 [medical malpractice].) Thus, like *Overly* itself, neither case involved or decided any issue concerning the damages allowable in such an action by section 377.34. To the contrary, *Overly* expressly rejected defendant's reliance on *Williamson, supra,* 23 Cal.App.4th 1406, rejecting that decision as "not relevant to this case because this is not 'a decedent's action.' " (*Overly, supra,* 74 Cal.App.4th at p. 173.)

Appellants' position that they are entitled to recover " 'lost years' damages" thus is unsupported by the plain statutory language, by principles of statutory construction, or by pertinent case authority. It is also inconsistent with the fundamental distinction between survival actions and wrongful death and other personal injury actions. Plaintiffs in personal injury actions may recover not only noneconomic damages (such as pain and suffering), but also *future* damages—that is, damages for "detriment . . . certain to result in the future." (Civ. Code, § 3283.) Such future damages may include, for example, future medical expenses, loss of future income, and future pain and suffering. (See, e.g., *Garcia v. Duro Dyne Corp.* (2007) 156 Cal.App.4th 92, 103–105 [plaintiff in personal

injury action was entitled to recover future medical expenses based on substantial evidence that his mesothelioma, although in remission at time of trial, was reasonably certain to recur].)  In survival actions, in contrast, damages are narrowly limited to "the loss or damage that the decedent sustained or incurred before death" (§ 377.34), which by definition *excludes* future damages.  For a trial court to award " 'lost years' damages" in a survival action—that is, damages for "loss of future economic benefits that [a decedent] would have earned during the period by which his life expectancy was shortened" (*Overly, supra*, 74 Cal.App.4th at p. 171)—would collapse this fundamental distinction and render the plain language of 377.34 meaningless.

Accordingly, we conclude that appellants were not entitled to recover damages for the value of services Decedent would have provided to his wife, had he survived, because those claims do not represent "loss or damage that the decedent sustained or incurred before death."[21]

### D. The Trial Court Did Not Err in Offsetting the Total Amount of Appellants' Pretrial Settlements Against the Judgment.

Appellants contend that the trial court erred by offsetting its award of economic damages by the full amount of the prior settlements, without allocating the value of those prior settlements as between the estate (which could recover only economic damages) and the heirs (whose recovery could include noneconomic damages).  "In general, 'a

---

[21] The same conclusion would seem to follow as to the trial court's award of damages for the value of Decedent's lost pension benefits and Social Security benefits.  However, Pep Boys' challenge to those awards is barred because Pep Boys did not cross-appeal from the judgment.  "A respondent who fails to file a cross-appeal cannot urge error on appeal." (*Kardly v. State Farm Mut. Auto. Ins. Co.* (1995) 31 Cal.App.4th 1746, 1748, fn. 1 [plaintiffs who prevailed in bad faith insurance case but were not awarded punitive damages could not challenge trial court's evidentiary rulings during punitive damage phase of trial].)  Section 906 provides a limited exception "to allow a respondent to assert a legal theory which may result in affirmance of the judgment." (*California State Employees' Assn. v. State Personnel Bd.* (1986) 178 Cal.App.3d 372, 382, fn. 7.)  Here, Pep Boys has not shown that review of this issue is necessary to determine whether any error was prejudicial as to appellants; thus, "we are not required to decide respondent['s] assertions of error in this respect." (*Building Industry Assn. v. City of Oceanside* (1994) 27 Cal.App.4th 744, 758, fn. 9.)

ruling granting or denying a section 877 settlement credit' is reviewed for an abuse of discretion. [Citation.] 'To the extent that we must decide whether the trial court's ruling was consistent with statutory requirements, we apply the independent standard of review.' " (*Hellam v. Crane Co.* (2015) 239 Cal.App.4th 851, 863 (*Hellam*).)

A nonsettling defendant is entitled to a setoff for all preverdict settlements "in the amount stipulated by the [settlement agreements], or in the amount of the consideration paid for [them], whichever is the greater." (§ 877, subd. (a).) "When multiple defendants are responsible for the same compensatory damages, a setoff is not only mandated under section [877, subdivision (a)], but is required by the fundamental principle that ' . . . a plaintiff may not recover in excess of the amount of damages which will fully compensate him for his injury.' " (*Hoch*, *supra*, 24 Cal.App.4th at p. 67.)

In tort or other actions based upon principles of comparative fault, it is necessary to allocate the prior settlement recoveries as between economic and noneconomic damages. That is because under Proposition 51, "the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault . . . ." (Civ. Code, § 1431.2, subd. (a).) Thus, "a personal injury defendant is no longer liable for any amount of the plaintiff's non-economic damages which exceeds the percentage of those non-economic damages attributable to that defendant." (*Espinoza v. Machonga* (1992) 9 Cal.App.4th 268, 272 (*Espinoza*); accord, *Jones v. John Crane, Inc.* (2005) 132 Cal.App.4th 990, 1006 (*Jones*) ["Defendant is jointly liable for plaintiffs' economic damages, and thus is entitled under section 877 to a credit for amounts previously recovered from other parties for these damages"]; *Greathouse v. Amcord, Inc.* (1995) 35 Cal.App.4th 831, 838 ["It is now well established that . . . section 877 allows [defendant] to set off settlement payments only for economic damages against the jury's verdict. Settlement payments attributable to noneconomic damages are not subject to the setoff"].)

As one court has explained, *Espinoza* "established the standard method for allocating proceeds from preverdict settlements between economic and noneconomic

damages so as to comply with both section 877.6 and Civil Code section 1431.2. [Citation.] Under *Espinoza*, a court calculates the percentage of the overall damages award that consists of economic damages, multiplies the settlement proceeds by that percentage, and reduces the economic-damages award by the resulting amount." (*Hellam, supra*, 239 Cal.App.4th at p. 863.) Here, as the trial court observed and appellants concede, the trial court awarded only economic damages to the estate; thus, the trial court properly applied a 100 percent ratio to the prior settlements.

In some cases, rather than follow this approach, courts may apply an allocation of the prior settlements as between economic and noneconomic damages, if there was a judicially approved express allocation in the settlement agreements themselves. (See *Pfeifer*, *supra*, 220 Cal.App.4th at pp. 1321–1322.) "Generally, an allocation in a settlement that has not been judicially approved does not bind the trial court. [Citation.] Rather, the party seeking the benefit of the allocation has the burden of presenting evidence that the allocation in the settlement is reasonable. Thus, the party must ordinarily show, by declarations or other evidence, that the allocation reflected a reasonable valuation of the pertinent claims, or that 'the allocation was reached in a sufficiently adversarial manner' to ensure a reasonable valuation. [Citations.] Absent such evidence, the court may properly reject the allocation in a settlement." (*Id.* at p. 1321 [trial court did not err in rejecting allocation of one-half of settlement funds to wrongful death claims, as specified in settlements, where plaintiffs failed to identify evidence sufficient to require the trial court to accept that allocation].)

Appellants charge the trial court with a "fundamental" error by offsetting the award in their favor by the full amount of their pretrial settlements, but it is appellants whose argument is fundamentally flawed. Appellants contend that "it was Pep Boys' burden to request an allocation" of the value of the pretrial settlements as between the estate and the heirs. Appellants are wrong. "A plaintiff has 'the burden . . . to show that [the defendant is] not entitled to a credit in the full amount of the settlements because some portion of the recovery should be allocated to other claims.' " (*Hellam*, *supra*, 239

Cal.App.4th at p. 860, quoting *Jones, supra,* 132 Cal.App.4th at p. 1009; accord, *Ehret v. Congoleum Corp.* (1999) 73 Cal.App.4th 1308, 1322 (*Ehret*).)

Appellants failed to meet their burden below. Appellants presented evidence that prior to trial, they had entered into settlements totaling $721,500. As the trial court observed, "These settlements were apparently all lump-sum settlements, without any allocation between Plaintiffs' claims based on wrongful death versus those based on the survivor's statute." Appellants did not present the settlement agreements themselves to the court, nor did they present any evidence, either in the form of an agreement between the parties allocating the settlement amounts as between economic and noneconomic damages or otherwise, as to how such an allocation should be made. Instead, they took the same mistaken position they repeat here: that "it is Pep Boys' burden to prove the proper allocation of those prior settlement amounts as between economic and noneconomic damages and between wrongful death and survival claims . . . ." Further, they asserted, "case law firmly establishes that Pep Boys is not entitled to *any* offsets in this case." Thus, because appellants failed to meet their burden, the trial court correctly concluded that Pep Boys was entitled to an offset in the full amount of the prior settlements.

*Ehret, supra,* 73 Cal.App.4th 1308 is squarely on point. There, the jury entered an award in favor of the heirs of Ehret and against defendant Congoleum Corporation in wrongful death asbestos litigation. While Ehret was still alive and damages for pain and suffering were potentially available, other defendants entered into settlements with the plaintiffs. The court first determined that in the absence of any other allocation, the ratio of economic damages to total damages reflected in the jury verdict must be applied to determine the percentage of the settlements to be offset. (*Id.* at pp. 1319–1320.) However, the court held, "assuming it would be proper for a court to allocate a settlement between economic and noneconomic damages in a proportion different from that reflected in the jury's verdict, Ehret's heirs did not meet their burden of proof in requesting such an allocation. Ehret's heirs had the burden of offering evidence of the terms of the settlements and the timing of the settlements in order to establish the good

41

faith of the allocation they proposed. They failed to meet this evidentiary burden, and therefore failed to establish a basis for an allocation other than that dictated by *Espinoza*." (*Ehret,* at pp. 1320–1321.)

Appellants asserts that *Ehret* is "vastly different" because it purportedly did not involve "claims *that were never resolved at trial* but which were released as part of the settlements, i.e., the wrongful death claims." Appellants again are wrong. In fact, *Ehret* dealt with exactly that situation, and rejected an argument nearly identical to appellants' here. In *Ehret*, as here, the plaintiffs' decedent had died prior to the trial verdict, and the case continued as a wrongful death action. (*Id.* at p. 1312.) The plaintiffs, like appellants here, contended that the trial court should allocate the settlement amounts between the wrongful death and personal injury actions, arguing that "such an allocation was required because the settlements were entered into while Ehret was alive and had a viable claim for pain and suffering, but the jury's verdict in the wrongful death action could not include damages for pain and suffering." (*Id.* at p. 1315.) However, the plaintiffs, again like appellants here, "did not present the settlement documents to the court, offer any evidence of the settlement terms, or provide any evidentiary support for their assertion that the settlements were entered into while Ehret was still alive. Plaintiffs offered no evidence in support of their requested allocation of damages (other than a description of Ehret's suffering included in their brief)." (*Ibid.*)

The court held that the plaintiffs had failed to meet their burden to support any post-verdict allocation other than that prescribed by *Espinoza*: "Where there is a complete dismissal of a defendant, and a plaintiff seeks an allocation of the settlement with that defendant for purposes of limiting the setoff against another defendant's liability, the burden is on the plaintiff to establish facts to justify the allocation. [Citation.] [¶] Ehret's heirs did not meet that burden in the court below. Because they sought a post-verdict allocation different from the calculation that *Espinoza* prescribes in the absence of a pretrial allocation, Ehret's heirs bore the burden of establishing an evidentiary basis for their proposed allocation. Plaintiff's argument that a major component of the settlements is attributable to pain and suffering obviously depends critically on whether the

42

settlements were agreed to before or after Ehret died. Moreover, plaintiffs' argument assumes sub silentio that the settlements were not structured to reduce the amount payable by a settling defendant if Ehret did not survive trial. Yet plaintiffs did not provide the court with evidentiary support for these critical assumptions." (*Ehert,* at p. 1322.)

Appellants' reliance on *Hackett v. John Crane, Inc.* (2002) 98 Cal.App.4th 1233 (*Hackett*) for their contention that the trial court erred in failing to allocate the amounts of the pretrial settlements as between the estate's claims and the heirs' claims fails for similar reasons. In *Hackett*, plaintiffs met their burden by presenting the settlement agreements and their terms in the trial court, and they filed an "allocation motion" setting forth their proposed allocation of the pretrial settlements as between economic and noneconomic damages, as well as between the heirs' wrongful death claims and the loss of consortium claim asserted by plaintiff's wife. (*Hackett,* at pp. 1237, 1239, 1243.) Here, in contrast, appellants did not present the settlement agreements, nor did they make any proposal to the trial court regarding the appropriate allocation.

Finally, appellants contend that the trial court erred in failing to allocate the prior settlement amounts as between economic and noneconomic damages because they submitted substantial evidence from which the trial court could have made such an allocation. But having failed to propose any allocation and urged the trial court to deny Pep Boys *any* offset, appellants are foreclosed from now arguing that the trial court erred in failing to follow an approach they never advocated below. " 'It is a firmly entrenched principle of appellate practice that litigants must adhere to the theory on which a case was tried. Stated otherwise, a litigant may not change his or her position on appeal and assert a new theory. To permit this change in strategy would be unfair to the trial court and the opposing litigant.' " (*Bermudez,* supra, 237 Cal.App.4th at p. 1323.)

**E. The Trial Court Erred in Awarding Pep Boys Its Expert Witness Fees Under Section 998.**

On December 4, 2014, Pep Boys served an offer to pay appellants $60,000 and waive the costs of its defense in exchange for a dismissal without prejudice of all claims

43

appellants had asserted against Pep Boys. The offer was "contingent upon acceptance by all plaintiffs as it is the intention of Pep Boys to obtain a full and final resolution of all claims asserted by plaintiffs in this matter by way of this offer." It stated, "Plaintiff Glenn Williams ('Plaintiff') is allowed to indicate acceptance of the offer by signing below that the offer is accepted," and provided signature lines for appellant Glenn Williams and for appellants' counsel. Appellants did not accept the offer. Because appellants did not achieve any net recovery, after the credit for the pretrial settlements, the trial court held that section 998 applied and awarded Pep Boys $16,724.10 in expert witness fees. Appellants claim that this was error because the offer was extended jointly, without any apportionment of the amount offered among them or their claims. In view of our decision that the trial court erred in declining to award any damages for home health care services, this issue will be moot, if the trial court on remand enters judgment awarding appellants a net recovery in excess of $60,000. Because we cannot predict the amount of that recovery, however, it is necessary for us to decide the issue. "The application of section 998 to undisputed facts is a legal issue we review de novo." (*Gonzalez v. Lew* (2018) 20 Cal.App.5th 155, 160 (*Gonzalez*).)

Section 998 allows for any party in a civil suit to serve a settlement offer to any other party before the commencement of trial.[22] Section 998, subdivision (c)(1) provides that "[i]f an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer. In addition, . . . the court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum to cover postoffer costs of the services of expert witnesses . . . actually incurred and reasonably necessary . . . during trial . . . of the case by the defendant." The burden of

---

[22] Section 998, subdivision (b) states, in relevant part, "[n]ot less than 10 days prior to commencement of trial . . . , any party may serve an offer in writing upon any other party to the action to allow judgment to be taken or an award to be entered in accordance with the terms and conditions stated at that time."

44

demonstrating that the offer is valid under section 998 falls " 'squarely on the offering party.' " (*Sanford v. Rasnick* (2016) 246 Cal.App.4th 1121, 1129.)

The general rule is that a section 998 offer to multiple plaintiffs is valid only if it is expressly apportioned among them and not conditioned on acceptance by all of them. (*Meissner v. Paulson* (1989) 212 Cal.App.3d 785, 791 (*Meissner*).)  The *Meissner* court reasoned that an unallocated offer to multiple plaintiffs is invalid under section 998 because a party receiving a joint unallocated offer may not be able to prove that he or she obtained a more favorable result at trial.  (*Id.* at p. 790, citing *Randles v. Lowry* (1970) 4 Cal.App.3d 68, 74.)  However, *Meissner* did not rest its decision on that ground, focusing instead on the fact that the defendant's offer required both plaintiffs to consent to settlement and to determine between themselves the apportionment.  (*Id.* at p. 791; see *Gonzalez*, *supra*, 20 Cal.App.5th at p. 162.)  Although the trial court determined that as between the *Meissner* plaintiffs, defendants could show that one, United Pacific, received a less favorable result, the Court of Appeal nevertheless found the offer invalid as to both.  "[N]either party could accept without the consent of the other party.  The offer inherently necessitated agreement between the parties as to apportionment between them. Although in this case we can say United Pacific received less than it would have under the offer, permitting such application of section 998 would introduce great uncertainty into this area of the law.  Plaintiffs would be required to second-guess all joint offers to determine whether a failure to reach agreement with co-plaintiffs would cause a risk of section 998 costs against them.  We believe the Legislature did not intend to place this burden on offerees.  To enforce the purpose of section 998, we find as a matter of law only an offer made to a single plaintiff, without need for allocation or acceptance by other plaintiffs, qualifies as a valid offer under section 998."  (*Id.* at p. 791.)

Cases after *Meissner* recognize this general rule.  "In general, ' "a section 998 offer made to multiple parties is valid only if it is expressly apportioned among them and not conditioned on acceptance by all of them." ' " (*Peterson v. John Crane, Inc.* (2007) 154 Cal.App.4th 498, 505 (*Peterson*); accord, *Menees v. Andrews* (2004) 122 Cal.App.4th 1540, 1544 ["It has long been held that a section 998 offer is effective to

shift liability for costs only where the offer was properly allocated as to multiple offerees and was made in a manner allowing individual offerees to accept or reject it."].) "There is an exception to this rule: where there is more than one plaintiff, a defendant may still extend a single joint offer, conditioned upon acceptance by all of them, if the separate plaintiffs have a 'unity of interest such that there is a single, indivisible injury.' " (*Peterson,* at p. 505.) [23] For example, parties with such a unity of interest include spouses who suffer an injury to community property. (*Gonzalez, supra,* 20 Cal.App.5th at p. 163, citing *Vick v. DaCorsi* (2003) 110 Cal.App.4th 206, 210–211.)

Pep Boys argues that this case falls within that exception to the general rule, and that the trial court correctly relied upon *McDaniel v. Asuncion* (2013) 214 Cal.App.4th 1201 (*McDaniel*). There the court held that plaintiffs in a wrongful death action have such a unity of interest. (*Id.* at p. 1206.) The court explained that "a wrongful death cause of action is atypical. Under California law, either the heirs or the personal representative on behalf of the heirs may bring a single joint indivisible action for wrongful death. [Citation.] This means that all heirs should join in a single action and there cannot be a series of suits by heirs against the tortfeasor for their individual damages. [Citation.] Any recovery for wrongful death is in the form of a lump sum, i.e., a single verdict is rendered for all recoverable damages. [Citations.] The respective rights of the heirs in any award are determined by the court based on the proportion that the heir's personal damage bears to the damage suffered by the others." (*Id.* at pp. 1206–1207.) Accordingly, the court reasoned, "there is no justification for invalidating a joint offer in a wrongful death case on the ground that it may be impossible to determine whether any one party received a less favorable result at trial than that party would have

---

[23] Although one justice dissented in *Peterson*, she "agree[d] with the majority's statement of the controlling law," including the general rule that a section 998 offer to multiple parties must be expressly apportioned and unconditional, and the unity of interest exception to that rule. (*Peterson, supra*, 154 Cal.App.4th at p. 516 (dis. opn. of Jones, P.J.).)

received under the offer. Rather, there is only one verdict to compare to the one joint offer." (*Id.* at p. 1208.)

If appellants had asserted only a wrongful death cause of action against Pep Boys, its position would have merit. But they did not. Rather, the pending claims Pep Boys offered to settle in December 2014 also included survival claims for strict products liability and negligence asserted by Glenn Williams on behalf of Decedent's estate. Appellants therefore were not seeking to recover for a single, indivisible injury, as the course of the litigation itself makes clear. The trial court granted Pep Boys' motion for judgment under section 631.8 as to the wrongful death cause of action and entered partial judgment against appellants. However, the case proceeded to trial and an award against Pep Boys (before the settlement offset) on the remaining claims. Under the circumstances, this case falls squarely within the general rule. As *McDaniel* itself recognizes, "where courts have required apportionment of a section 998 offer made to multiple plaintiffs, the offerees have either had *different causes of action* against the offeror or the potential for separate verdicts and varying recoveries on a single cause of action." (*McDaniel, supra*, 214 Cal.App.4th at p. 1206, italics added.) In such circumstances, "when one offer is made to multiple plaintiffs, the plaintiffs need to agree between themselves as to apportionment before accepting the offer. [Citation.] As the *Meissner* court noted, permitting such joint offers would introduce great uncertainty in that plaintiffs would be required to second-guess all joint offers to determine whether a failure to reach agreement with coplaintiffs would cause a risk of section 998 costs against them. [Citation.] Thus, a defendant must serve a separate offer on each individual plaintiff. In other words, the defendant must apportion the offer between the plaintiffs." (*Id.* at p. 1208.)

47

Because Pep Boys did not apportion its offer among appellants' distinct claims,[24] its offer was invalid, and the trial court's award of expert witness fees to Pep Boys must be reversed.

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court for further proceedings in accordance with this opinion.

---

[24] This court need not enter the debate between the majority and dissenting opinions in *Peterson* as to whether a single plaintiff who sues in different capacities should be considered one party or multiple parties for purposes of section 998. (See *Peterson, supra,* 154 Cal.App.4th at pp. 506-513 [one party]; compare *id.* at pp. 516–521 [multiple parties] (dis. opn. of Jones, P.J.).) There is no dispute that appellants in their capacity as individual heirs are distinct parties from Decedent's estate, represented by Glenn Williams in his capacity as Decedent's successor in interest.

Superior Court of the City and County of San Francisco, No. CGC 11275749, Hon. Teri Jackson and Charles F. Haines, Judges.

Farrise Law Firm, Simona A. Farrise and Alina Guzman; Arkin Law Firm, Sharon J. Arkin, for Plaintiffs and Appellants.

Dentons US, Jules S. Zeman, Bradford J. DeJardin, Jennifer J. Lee, for Defendant and Respondent.

_____

Schulman, J.*

We concur.

_____

Streeter, Acting P.J.

_____

Reardon, J.

* Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.